The appellant, Stephen Clyde Baker, was convicted of driving under the influence of alcohol in Huntsville Municipal Court and appealed to Madison County Circuit Court. He was tried without a jury, again found guilty, and was sentenced to 90 days' imprisonment in the Huntsville municipal jail.
The prosecutor presented the evidence of two police officers. Officer Sherry Wilburn, a D.U.I. enforcement officer with the Huntsville Police Department, testified that on the night in question she was on patrol and that at one point, while slowing down for a stop sign, she observed the appellant driving by her at a very high rate of speed. He ran a red light, and she pursued him. She further testified that, in chasing the appellant, she was traveling in excess of 80 miles per hour and, therefore, estimated the appellant's speed to be at least in excess of 80 miles per hour. She testified that she and Sergeant Wooten, who was with her, had turned on the blue lights and sirens. The appellant then pulled into the Jet gasoline station, parked his vehicle, and was entering the store by the time the police officers got out of their vehicle. Officer Wilburn further testified that she stopped the appellant just before he entered the door, informed him of her identification, and asked him if he knew how fast he was traveling. He responded "no" and further denied knowledge of running the red light. She then informed him that she was going to give him a few sobriety tests. The appellant, after taking and failing one of these tests, refused to take any additional test. Officer Wilburn testified that she then informed the appellant that if he did not take the tests, she would have to place him under arrest on the basis of her observations, which she did. The appellant was then transported to the B.A.T. van and given a breathalizer test. Officer Wilburn also testified that it was approximately 30 minutes until the appellant could take the test and that, during that period, the appellant did not ingest anything, including alcoholic beverages.
Officer Wilburn testified that when she stopped the appellant, his eyes "were extremely red and glossed over. His sentences were, at some time, incoherent, in that he would begin a sentence and stop and start another one, was not completing all his words. He was mumbling on about certain things, about — that I [Officer Wilburn] couldn't understand what he was talking about, had no relation to what we were doing, whatsoever. He would be belligerent at times, then calm at others." She further stated that he had the odor of alcoholic beverages on his breath and that he was walking very slowly as if "he was taking extra care with his steps." Officer Wilburn testified that, based on her experience, she believed the appellant was under the influence.
Officer Wilburn, on redirect examination, stated that, after the test was given to the appellant, he requested a blood test several times. He was therefore taken to the Huntsville Hospital emergency room, while still handcuffed. The nurses explained to him the procedures for paying for the test. *Page 929 
Officer Wilburn testified that she told the appellant that they (apparently the police officers) would get his wallet so that he could pay for the tests. She further testified that he then became belligerent and stated that he did not want Officer Wilburn to touch his money. She explained to him that she could not unhandcuff him, as it was against police procedure, but that she could remove his wallet, count his money in front of the nurses and that he would receive a receipt in return for his payment. She further testified that he became upset, stated that no one was touching his money, and that he had the constitutional right to a blood test. She testified that she explained to him that although he had the right to a blood test, the police department would not pay for the test. He then stated that he would pay for the test after it was given, but the nurse told him that he would have to pay in advance. Subsequently, Officer Wilburn stated, because of the commotion the appellant had caused, she agreed to unhandcuff him if he would take out his money and pay for the test. He refused to give his money to anyone, and Officer Wilburn informed the appellant that he had "five seconds to make up [his] mind" and that if he did not decide to pay for the test, she would take him back to the jail. Thereafter, the appellant refused to get out of the chair in which he was sitting, so Officer Wilburn grabbed him by the arm and pulled him up. He then sat on the floor and refused to stand. She further testified that the hospital guard held her and they pulled the appellant out to the police car. The appellant continued to fight Officer Wilburn and the guard as they forced him into the police car. The appellant was then taken to the jail and, after he was booked, indicated that he had changed his mind and would pay for the blood test. However, Officer Wilburn refused to take the appellant back to the hospital.
Thomas Scott Sterling, of the Huntsville Police Department, testified that he was qualified to operate an Intoxilizer 5000 machine. He stated that he had been operating the breath instruments for approximately six years and had been retrained on the new instrument approximately two years before. He further stated that he attended continuing training sessions annually and that he was certified by the State Board of Health. Officer Sterling testified that he administered the breathalizer test on the appellant and followed the methods and procedures approved by the State Board of Health. He further stated that the machine he used to test the appellant was inspected on a monthly basis and, moreover, that it was approved by the Huntsville Police Department for use in determining whether someone was under the influence of alcohol. Officer Sterling testified that the result of the appellant's test showed .11 percent blood alcohol content.
The appellant's testimony conflicted greatly with the testimony of Officer Wilburn and Officer Sterling. The appellant testified that, on the night in question, he had met a date at a lounge and that, between 9:00 p.m. and approximately 2:00 a.m., he drank at least two glasses of white wine. Thereafter, he said, he followed his date home and then stopped at the Jet Station in order to purchase some orange juice. The appellant testified that he had been driving at a rate of approximately 40 to 45 miles per hour. The appellant stated that, before he entered the store, two police cars pulled up and two police officers approached him and began questioning him. He said that before the female officer spoke to him, she shoved her finger in his face and began moving it side to side. The appellant testified that the female officer never identified herself nor stated that she was giving a field sobriety test, but she merely turned to the male police officer and stated that the appellant had "flunked the eye test." He said she ordered him to pick up his leg. The appellant stated that he did not lift his leg because he did not believe "that she had any intention of conducting any sort of fair test." He was handcuffed and taken to a van. He further stated that Officer Sterling was not the man who administered the breath test. Appellant further testified that after he had taken the test, he asked the administering officer what type of test he had taken. *Page 930 
The officer responded that it "was a crude alcohol level test." The officer stated that if the appellant wished to take a blood test, he could do so. The appellant requested the test and was taken to Huntsville Hospital. The appellant testified that he was shoved by the police officers while they were taking him to the hospital. The appellant stated that, after they arrived at the hospital, he agreed to pay for the blood test in advance. He testified that his hands were still cuffed and that he could not remove his money. He further testified that he had determined that if he was to pay for the blood test, he did not want any of the officers handling his money. However, he said, Officer Wilburn refused to unhandcuff him and, after five seconds, he still demanded his blood test. He said he was pulled out of his chair and dropped on the floor and thereafter was taken back to the jail.
 I
The appellant argues that the trial court was in error in sentencing him to 90 days' confinement in the municipal jail on the basis of his being a second offender. However, the record does not support the appellant's contention; there is no indication that the trial court was under the impression that this was the appellant's second offense. During the sentencing phase, the trial court asked to be informed of the appellant's record. The defense counsel, as well as the prosecutor, responded that there were no prior convictions. The trial court then asked if either party had anything else to say. The following then transpired:
 "[Defense Counsel]: Under the circumstances of this case, if the court is going to sentence him, we ask the court to be as lenient as the court possibly can under the circumstances.
 "THE COURT: I'm going to do that. You are at this time sentenced to ninety days' confinement in the city jail, in the municipal jail."
The trial court knew at this stage of the proceeding that it was the appellant's first offense. However, at one point during the appellant's hearing on his motion for new trial, the trial court evidently believed that this was the appellant's second conviction for D.U.I. The following transpired during those proceedings:
 "THE COURT: . . . I'm asking you [the appellant] if you want me to put you on probation and suspend all of the sentence that can be suspended, and put you on probation. You see, you sentence is ninety days, the law requires that you serve — it's mandatory that you serve two days, which is 48 hours.
 "THE DEFENDANT: It's not mandatory that I be beaten. I had heard that people were beaten in the Madison County Jail.
 "THE COURT: Hold on, you are not listening to me. It is mandatory that on that sentence you serve forty-eight hours.
 "THE DEFENDANT: It's not on the first, according to the State Driver's License Handbook, which I have been studying.
 "THE COURT: Is this a first or second? "[PROSECUTOR]: Yes, sir, it's a first time.
 "THE COURT: So, there is no mandatory — it is not mandatory that any of it be served?
"[PROSECUTOR]: No, sir.
 "THE DEFENDANT: I have served approximately two days already to which I have been jailed, I have been beaten.
"THE COURT: All right. Let me back up.
 "THE DEFENDANT: There have been improper judicial proceedings.
 "THE COURT: Do you want me to consider you for probation and suspend all of the sentence and put you on probation? "THE DEFENDANT: I wish to have the previous verdict reversed.
 "THE COURT: Okay. Well, Steve, your motion for new trial — you have filed a motion for new trial and that's what we are here for, your motion for new trial is denied, at this point, and that is all that this hearing is for. That decision has now been made and this case will proceed. *Page 931 
I had hoped to be able to help you, and I had hoped to be able to do something that might be in your best interest. Like I said, I am more concerned about your welfare, I am more interested in trying to do something to help you than I am just to say incarcerate you."
Although the trial court was evidently uncertain of the appellant's prior record, when he made the offer to suspend the remainder of the appellant's sentence, the record indicates that, when the ninety-day sentence was imposed, the trial judge understood that the appellant had no prior convictions.
Section 32-5A-191(c), Code 1975, provides:
 "Upon first conviction [for driving under the influence], a person violating this section shall be punished by imprisonment in the county or municipal jail for not more than one year, or by fine of not less than $250.00 nor more than $1,000.00, or by both such fine and imprisonment. In addition, on a first conviction, the director of public safety shall suspend the driving privilege or driver's license of the person so convicted for a period of 90 days. First time offenders convicted of driving while under the influence of alcohol shall also be required to complete a DUI court referral program approved by the state administrative office of courts."
Thus the appellant's sentence clearly falls within the statutory limits and, thus, this court has no authority to review this sentence. Beavers v. State, 497 So.2d 612, 618
(Ala.Cr.App. 1986), and cases cited therein. Nor is this sentence violative of Solem v. Helm, 463 U.S. 277,103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), which applies to sentences of life imprisonment without parole. German v. State, 500 So.2d 478,480 (Ala.Cr.App. 1986).
 II
The appellant argues that the trial court erred to reversal in denying his motion for a new trial because, he says, he did not receive a fair and impartial trial due to his claimed alcoholism and possible state of mental illness. He alleges that this mental illness was unknown to his trial counsel and to the trial court until after sentencing. The record contains a letter concerning a mental status examination and evaluation undertaken by Dr. Dan Calhoun and Susanna Blanchard of the Huntsville-Madison County Mental Health Center. The letter explained that the appellant had a history of paranoid schizophrenia. The letter indicated that both his long- and short-term memory appeared to be intact and that he indicated he did not desire therapy or treatment. The letter further stated that, based on the evaluation, there was no reason the appellant could not be held responsible for his actions at the time of the alleged offense. The appellant was found to be suffering from two primary problems, one, his chronic paranoid adjustment and, two, alcoholism. Individual therapy and the Day Treatment Program were recommended to benefit the appellant and, during the appellant's motion for new trial, the trial court attempted to make such treatment a condition of probation. The appellant indicated that he would not submit to such treatment.
A trial of an accused while he is incompetent violates due process. Wagner v. State, 489 So.2d 623, 628 (Ala.Cr.App. 1985); Bishop v. United States, 350 U.S. 961, 76 S.Ct. 440,100 L.Ed. 835 (1956). "The test for determining competency to stand trial is whether the defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him.' Dusky v.United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824
(1960); Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896,43 L.Ed.2d 103 (1975)." Anderson v. State, 510 So.2d 578
(Ala.Cr.App. 1987). This determination should be left to the discretion of the trial court.
 "The trial judge, who hears and sees the evidence and observes the defendant, is in a far better position to determine a defendant's competency to stand trial than a reviewing court, which relies on the record. See, Williams v. State, 386 So.2d 506 (Ala.Cr.App. 1980); citing, *Page 932 Richardson v. State, 354 So.2d 1193 (Ala.Cr.App. 1978). Therefore, 'the decision of the trial judge on such a matter is raised on appeal only upon proof of abuse of discretion.' Livingston [v. State, 419 So.2d 270, 274 (Ala.Cr.App. 1982)], citing, Williams, 386 So.2d at 510; and Richardson, 354 So.2d at 1193." Anderson v. State, supra at 580.
The record is void of any indication that the trial court's decision was arbitrary or unsupported by the evidence.Minnifield v. State, [Ms. 6 Div. 129, February 10, 1987] (Ala.Cr.App. 1987).
Furthermore, there has been no showing as to why the defense counsel could not have discovered the evidence concerning the appellant's prior treatment for mental illness through the exercise of due diligence. Isom v. State, 497 So.2d 208
(Ala.Cr.App. 1986); Siniard v. State, 491 So.2d 1062
(Ala.Cr.App. 1986).
 "Counsel has a duty to conduct a reasonable investigation of the possibility of an insanity defense where the accused has demonstrated history of mental illness. Alvord v. Wainwright, 725 F.2d 1282, 1288-89 (11th Cir.), modified, 731 F.2d 1486
(11th Cir.), cert. denied, 469 U.S. 956, 105 S.Ct. 355, 83 L.Ed.2d 291 (1984); Mauldin v. Wainwright, 723 F.2d 799, 800 (11th Cir. 1984) ('In a case where the sole theory of defense is one of insanity due to alcoholism, we believe that minimally effective representation must include an investigation into the defendant's past and present medical condition.') 'Counsel has an affirmative obligation to make further inquiry where the facts known and available, or within minimal diligence accessible to defense counsel raise a reasonable doubt as to the defendant's mental condition.' Lowe v. United States, 545 F. Supp. 662, 666 (E.D.Va. 1982). Walker v. Mitchell, 587 F. Supp. 1432, 1439-40 (E.D.Va. 1984) ('If the law provides that the defendant cannot be convicted of the crime charged if he was too intoxicated to form the requisite intent, and preliminary indications create reasonable grounds for suspecting that the defendant may have been so intoxicated, then counsel has a duty to make further inquiry.'). 'This court does not sit to second guess strategic and tactical choices made by trial counsel. . . .' " Dill v. State, 484 So.2d 491, at 497-98 (Ala.Cr.App. 1985).
The appellant further contends that the results of the field test administered by Officer Wilburn could have been to affect the appellant's mental disorder. Specifically, Officer Wilburn administered the Horizontal Gaze Nystagmus, in which an effect of intoxication is demonstrated by a "jerking of the eyeball." However, the record indicates that probable cause for the appellant's arrest was not merely due to the appellant's failing the field sobriety test. Rather, the record indicates that the appellant ran a red light traveling at a rate of speed allegedly in excess of 80 miles per hour; the appellant refused to take any more field sobriety tests; the appellant's speech was incoherent, he mumbled, and his eyes were red and glossed over; his walk was unnaturally slow; and his breath smelled of alcohol. Therefore, Officer Wilburn had sufficient probable cause to transport the appellant to the B.A.T. van in order to have a breath test administered. See Buchanan v. City ofAuburn, 512 So.2d 145 (Ala.Cr.App. 1987).
 III
The appellant argues that the trial court was in error in ruling that he was not deprived of his legal right to a blood test due to the alleged "arbitrary and unreasonable restraint by the police officer who held him in custody while handcuffed at the Huntsville Hospital emergency room where he had been taken, after due request for the test." The appellant's contention is without merit. The record clearly indicates that the appellant was given every opportunity to submit to a blood test after payment therefor. Furthermore, Officer Wilburn testified that she initially refused to remove the appellant's handcuffs because of police procedure, because of threats made by the appellant in the police car en route to the hospital, and because the appellant had been behaving in a belligerent manner and she feared for the public's *Page 933 
safety. Officer Wilburn offered to remove the appellant's money, or have hospital personnel do so, in order to pay for the blood tests. She further offered to count the money in front of the appellant and other witnesses. See Clark v. State,280 Ala. 493, 496, 195 So.2d 786, 788 (1967), Clark v. Alabama,387 U.S. 571, 87 S.Ct. 2071, 18 L.Ed.2d 967 (1967) (shackles or handcuffs are proper where such restraint is necessary to prevent a prisoner's escape or rescue.) See also Minnifield v.State, [Ms. 6 Div. 129, February 10, 1987] (Ala.Cr.App. 1987).
 IV
The appellant contends that the trial court erred to reversal in admitting the results of the Intoxilizer 5000 test. Specifically, the appellant argues that the results should not have been admitted into evidence because the log book of the Intoxilizer 5000 machine was never produced or admitted into evidence and because "sediment of prior testees' breath and inner substances in the machine" could have affected the test results. Officer Sterling testified that it is not possible that the appellant's tests could have been adulterated because the machine might have picked up some residue from a test prior to this defendant's test. He explained that the instrument "intakes" air twice before each test and that the flexible plastic tube is heated to prevent condensation of any moisture and to prevent "anything from staying in it." He further testified that the two blank air samples, which show that the machine has been cleaned before the test, appear on the readout.
Furthermore, the State laid a proper predicate for the admission of the Intoxilizer 5000 test results.
 "In Ex parte Bush, 474 So.2d 168 (Ala. 1985), this Court addressed the issue of what elements were necessary to lay the proper predicate for admissibility of the P.E.I. test results. There we said:
 " 'This predicate may be established by showing, first, that the law enforcement agency has adopted the particular form of testing that was in fact used. Alabama Code 1975, § 32-5A-191(a) [sic, § 32-5-192(a)]. See Estes v. State, 358 So.2d 1050
(Ala.Crim.App. [1977]), cert. denied, 358 So.2d 1057 (Ala. 1978). Second, there must be a showing that the test was performed according to methods approved by the State Board of Health. Alabama Code 1975, § 32-5A-194(a)(1). See Commander v. State, 374 So.2d 910 (Ala.Crim.App. 1978). This may be proved by the introduction of the rules and regulations the officer followed while administering the test and the officer's testimony that he did, in fact, follow those rules when he administered the test in question. Parker v. State, 397 So.2d 199 (Ala.Crim.App. 1981). Patton v. City of Decatur, 337 So.2d 321 (Ala. 1976). Third, there must be a showing that the person administering the test has a valid permit issued by the State Board of Health for that purpose. Alabama Code 1975, § 32-5A-194(a)(1).' 474 So.2d at 170."
Ex parte Reed, 492 So.2d 293, 294 (Ala. 1986).
The record indicates that Officer Sterling testified that he was certified by the State Board of Health, and defense counsel stipulated to that certification when his certification card was introduced. The State also introduced into evidence a copy of the operational procedure administered with check marks beside each test performed. There was also a copy of the print-out sheet that was injected into the instrument, which contained a report of the alcohol content and which was introduced into evidence. Officer Sterling testified that the Intoxilizer 5000 machine was inspected on a monthly basis and was approved by the Huntsville Police Department for use in determining whether someone is under the influence of alcohol. He further testified that the instrument and procedures used were approved by the State Board of Health. The defense counsel on cross-examination questioned Officer Sterling as to why he did not bring the log book, to which he responded that he did not have access to the log book, as it was kept in the B.A.T. van, which was located at the police academy. The defense counsel, in making the motion to exclude *Page 934 
the blood test evidence, noted that his ground for objecting on the basis of an improper predicate was that it had not been shown that the City of Huntsville had approved that particular machine. However, the record clearly shows that Officer Sterling testified that it had been approved. The results of the intoxilizer 5000 test were properly admitted into evidence.
AFFIRMED.
All the Judges concur.