701 So.2d 58 (1997)
M.D.
v.
STATE.
CR-95-0947.
Court of Criminal Appeals of Alabama.
February 28, 1997.
Rehearing Denied May 2, 1997.
Certiorari Denied August 15, 1997.
*59 R. Wendell Sheffield, Birmingham; and Bryan A. Stevenson, Montgomery, for appellant.
Bill Pryor, atty. gen., and Cecil Brendle, Jr., asst. atty. gen., for appellee.
Alabama Supreme Court 1961356.
COBB, Judge.
M.D. appeals from an order of the Jefferson County Juvenile Court directing that he be transferred to the circuit court for prosecution as an adult on charges of capital murder and robbery. He raises five issues on appeal.

I
M.D.'s first argument is that the juvenile court failed to follow the mandates of Ala.Code 1975, § 12-15-34(c), which require the court to determine whether he should be committed involuntarily to the Department of Mental Health and Mental Retardation ("the Department") due to his mental retardation. The State argues that the juvenile court followed the procedures set out in the statute.
The transfer of a juvenile to circuit court for prosecution on a criminal charge is governed by Ala.Code 1975, § 12-15-34. Subsection (c) of that statute provides:

*60 "When there are grounds to believe that the child is committable to an institution or agency for the mentally retarded or mentally ill, the court shall proceed as provided in Section 12-15-70."
Section 12-15-70 provides, in relevant part, that a juvenile court may order a child to be examined by a mental health professional, who will then report the child's condition to the court. That section further provides that if the report leads the court "to believe that a minor or child is mentally ill or mentally retarded, as defined in this chapter, the court shall proceed in the manner set out in Section 12-15-90." (Emphasis added.)
Section 12-15-90 authorizes the involuntary commitment of minors and provides a procedure for that commitment. Section 12-15-90(j) provides that a court may order the commitment of a minor to the Department due to his mental retardation if there is substantial evidence 1.) that the child is mentally retarded; 2.) that the child is not of borderline intelligence or mildly retarded; and 3.) that, if the child is allowed to remain in the community, he is likely to cause serious injury to himself or to others or that adequate care, rehabilitation, and training opportunities are available only at one of the Department's facilities. While certain of the procedures are mandatory, the commitment decision remains in the court's discretion.
M.D. contends that the juvenile court failed to follow the procedures mandated by the statute and, instead, "conducted a competency determination as a new method by which to determine the propriety of juvenile transfer to criminal court for someone with significant mental retardation." He alleges, further, that "after the court found that he was competent to stand trial, it without further analysis authorized transfer to criminal court." (Appellant's brief at page 16; emphasis added.) M.D.'s arguments, however, are not supported by the record. The record reflects that the juvenile judge took great care to follow the mandates of the law, to protect M.D.'s rights, and to act in accordance with M.D.'s best interests. Details regarding the procedural history of the case, the evidence elicited at the hearings, and the juvenile court's statements and orders are necessary to the resolution of this issue.
Fifteen-year old M.D. was charged with capital murder and first degree robbery for his participation in the April 9, 1995, robbery of Courtney and Betty Long, and the murder of Betty Long while both were inside Tenth Avenue Cleaners, a business Betty and her husband owned. On April 12, 1995, the State filed a motion to transfer, pursuant to § 12-15-34, Ala.Code 1975. On April 19, 1995, M.D.'s attorney filed a motion for a mental health evaluation; he requested that the court determine whether M.D. was insane at the time of the crime and whether he was competent to stand trial. The trial court granted the motion.
Dr. Wendy Rebert, a licensed clinical psychologist and certified forensic examiner, examined M.D. on June 21, 1995, to determine his competence to stand trial, his mental state at the time of the alleged offense, and the propriety of the transfer to circuit court. In her report, Dr. Rebert stated that she had assessed M.D.'s competency to stand trial by reviewing certain records, by conducting an interview, and by administering the Competency to Stand Trial Assessment Instrument,[1] and she found that M.D. "was fully capable of assuming the role of defendant at the present time." (C. 133.)[2] Dr. Rebert also found that M.D. was competent at the time of the alleged offense. Finally, Dr. Rebert stated that she believed that transfer to circuit court was in the best interests of M.D. and of the community, in part because there were no other available options. She acknowledged that M.D.'s IQ score was in the moderate range of retardation, but said that he was capable of behaving in a socially appropriate manner when it was to his best advantage to do so.
On September 20, 1995, the trial court held a hearing. The court clearly explained the purposes of the hearing and the order in *61 which it would address those purposes. The court stated that it would first hear defense counsel's competency motion; that if M.D. was found to be competent to stand trial, the court would next hear the State's evidence to determine whether probable cause existed; and that if probable cause was found, the third part of the hearing would be devoted to determining whether M.D. should be transferred to stand trial in circuit court. (R.I, 8-12.) As the details below will demonstrate, the court followed the procedure outlined above; thus, M.D.'s claims that the juvenile court ordered his transfer on the basis of a competency determination alone, and without further analysis of the propriety of a transfer, is simply false.
First, Dr. Rebert testified extensively about her forensic evaluation of M.D. She testified in detail about her assessment of M.D.'s competency to stand trial and her determination that he was competent. Dr. Rebert also stated that M.D. achieved a full scale IQ score of 48 on the Wechsler Intelligence Scale for Children, that the results were consistent with an earlier administration of the IQ test, and that this score was in the moderate range of mental retardation. She also testified that M.D.'s IQ score did not reflect his true potential. Dr. Rebert stated that an IQ score of 48 was not, by itself, sufficient evidence to find M.D. incompetent to stand trial; she explained that individuals with little formal education typically achieve IQ scores that underestimate their true abilities. She stated that she believed that M.D.'s actual intelligence level and true potential were higher than reflected by his IQ score. She also testified that a person with a true functioning level of 48 would not have a clear, articulable understanding of the court system, and M.D. exhibited a high level of understanding of the system.
Dr. Rebert testified that she could not make a clinical diagnosis of mental retardation without assessing M.D.'s adaptive functioning, which she described as a measure of his ability to perform the activities of daily living; however, Dr. Rebert testified that she never performs that assessment when conducting forensic evaluations because adaptive functioning is not relevant to a determination of competency. (R. II, 64-68, 73-75.)
The judge stated that an IQ of 48 was so low that she would typically find the person incompetent; however, when presented with expert testimony that M.D. was competent, the judge was willing to consider that testimony and the expert's basis for that conclusion. Dr. Rebert then explained again, in detail, that from her interview and assessment, she determined that M.D. understood and could articulate his understanding, for example, of the charges against him, the possible punishment, and the trial procedure, and that he could aid his attorney in his defense.
M.D.'s stepfather testified that he had concerns about M.D.'s mental health. He said that M.D. had urinated in his bedroom and had hidden food in dresser drawers. He also testified that when he was younger, M.D. cut his siblings with a knife.
After considering the foregoing testimony, and the testimony of M.D.'s stepfather regarding M.D.'s bizarre behavior, the court found that M.D. was competent to stand trial.
The court proceeded to the second stage of the hearinga determination of whether there was probable cause to believe that M.D. had committed the offense. The court found probable cause as to both charges, and ordered the parties to reconvene the next day for a hearing on the motion to transfer.
When the parties returned on September 21, 1995, for the transfer hearing, the judge informed the parties that, upon further reflection and due to M.D.'s low IQ score, she would be more comfortable in making a competency determination after M.D.'s adaptive functioning level was tested. On its own motion, the court then set aside its previous ruling and reserved ruling on competency, and ordered Dr. Rebert to conduct adaptive skills testing. Dr. Rebert then completed the Vineland Social Maturity Scale to determine M.D.'s level of adaptive functioning. In her report of these results, Dr. Rebert stated that M.D. "achieved a social age of 12 years." She explained that a diagnosis of mental retardation required a significantly subaverage IQ score and deficits in social/adaptive *62 functioning. M.D.'s IQ score was significantly subaverage, but Dr. Rebert reported that she could not state that his Vineland score was subaverage, even though it was below his chronological age. (C. 89.) Thus, Dr. Rebert's testing of M.D.'s adaptive skills confirmed her earlier determination that M.D. was functioning at a level higher than that reflected by his IQ score of 48.
M.D.'s attorney disagreed with Dr. Rebert's professional opinion, and she suggested he seek a second opinion. The court then ordered a second competency evaluation for M.D.
Dr. C.J. Rosecrans, a licensed psychologist, professor emeritus of psychiatry, and certified forensic examiner, evaluated M.D. pursuant to the court's order. According to his report of the evaluation, Dr. Rosecrans found M.D. to be "functionally a `slow learner' to mildly retarded (FUNCTIONALLY 60 to 70 IQ) but ... severely ACADEMICALLY retarded." (C. 108.) Dr. Rosecrans testified at the second portion of M.D.'s competency hearing, which was held on February 9, 1995. He stated that he concurred with Dr. Rebert's determination that M.D. was competent to stand trial and that M.D. was competent at the time of the crime; he also "endorsed" Dr. Rebert's report of M.D.'s functional mental age. Dr. Rosecrans testified in detail about M.D.'s emotional immaturity and impulsiveness, but concluded that M.D. could nonetheless aid in his own defense. After considering the foregoing evidence, the court found M.D. competent to stand trial.
Finally, the court considered the motion to transfer. The court addressed the statutory factors relevant to the transfer issue and considered the arguments of the parties, then ordered that M.D. be transferred to the circuit court for trial as an adult. In the written order to transfer, the court detailed the records and testimony it considered, as well as the factors set out in § 12-15-34, and found that M.D. "is not committable to an institution or agency for the mentally retarded or mentally ill; and further [found] by clear and convincing evidence presented that the best interests of the child and public would be to grant the Motion to Transfer." (C. 56-57.)(Emphasis added.)
We reject M.D.'s first contention, that the juvenile court failed to follow the statutory mandates regarding commitment and consider whether he suffered from such significant mental retardation that he was committable to the Department. As detailed above, the court evidenced tremendous concern about M.D.'s low IQ score and about his level of adaptive functioning; on its own motion the court set aside its initial finding regarding competency and ordered two additional evaluations of M.D. in order to obtain information about his functional abilities. The court engaged in extensive questioning of the experts at each hearing. Appellate counsel's assertion that this judge "did not concern herself with M.D.'s mental retardation" (appellant's brief at p. 11) completely conflicts with the record.
We note, additionally, that defense counsel did not file a petition for involuntary commitment pursuant to § 12-15-90, he filed a motion requesting a mental health evaluation and requesting a hearing on M.D.'s competence to stand trial and his mental state at the time of the alleged crime. When considering the motion, the court, of necessity, made a substantial inquiry into M.D.'s mental deficits and considered the option of commitment. (R. III, 333-34.) The court was presented with the unequivocal testimony from two experts that M.D. was functioning above the moderate range of mental retardation and above his IQ score of 48. This court has held that a low IQ score alone will not support a finding that a child is committable to the Department. B.C.B. v. State, 631 So.2d 283, 285 (Ala.Crim.App.1993). Thus, we agree with court's finding that M.D. was not eligible for commitment to the Department pursuant to § 12-15-90(j).
Accordingly, we hold that the juvenile court followed the proper procedures in this case, gave cautious and thorough concern for accuracy and completeness in its evaluation of M.D.'s intellectual level as it related to all of the issues before it, and correctly determined that M.D. was not committable to the Department.

*63 II
M.D. next alleges that the juvenile court's finding that there was probable cause to believe that he committed the offenses is not supported by the evidence, because, he says, the State failed to prove that he had the specific intent to kill. The State correctly argues that, because he did not object to the court's probable cause finding, M.D. failed to preserve this argument for review. Even if the issue had been preserved, we would not grant M.D. the relief he requests because the trial court's finding that probable cause existed was proper.
"`[A] transfer hearing is not a hearing to adjudicate the guilt or innocence of the child accused of a crime but is, instead, a probable cause hearing to determine whether the child should be transferred out of the juvenile court for criminal prosecution as an adult.' Brown v. State, 353 So.2d 1384, 1387-88 (Ala.1977). At the probable cause phase, the court must find that `a reasonable man would believe the crime occurred and that the defendant committed it.' Duncan v. State, 394 So.2d 930, 932 (Ala.1981)."
J.M.V. v. State, 651 So.2d 1087, 1090 (Ala. Crim.App.1994). This Court has also held that it will not interfere with a lower court's order unless that order is clearly erroneous. J.M.V., supra.
The State's evidence at the transfer hearing tended to show that, armed with pistols, M.D. and another youth entered a business and robbed Betty Long and Courtney Long of money and jewelry; one of the youths shot Betty Long, and she died during surgery. Courtney Long, the daughter of the deceased, positively identified M.D. as one of the participants. She testified that M.D. was standing nearer her mother than was the other robber, and that M.D. took the money from her mother. Courtney also testified that she did not know which of the youths shot her mother. The State presented evidence sufficient for the court to conclude that "a reasonable man would believe the crime occurred and that the defendant committed it." The trial court's finding as to probable cause was not clearly erroneous.

III
M.D. argues that the juvenile court employed improper procedures and then incorrectly determined that he was competent to stand trial. Specifically, he contends that the trial court should have impaneled a jury to determine his competency, and that the court improperly "relied entirely on incomplete mental health assessments" instead of making a legal determination of his competency. First, we note that M.D. has waived review of these issues by failing to object before the juvenile court. Second, even if we were to find that he had preserved the issues, we would not disturb the court's determination that M.D. was competent.
M.D.'s reliance on Ala.Code 1975, § 15-16-21, for the proposition that the question of his competency to stand trial should have been determined by a jury, is misplaced. That article of the Code applies to "any person other than a minor in confinement, under indictment." Ala.Code 1975, § 15-16-20, (emphasis added). When proceedings in juvenile court are initiated for the purpose of committing a mentally retarded minor to the Department, Ala.Code 1975, § 12-15-90 controls, and subsection (g)(4) provides that all hearings are to be held before the court without a jury. No error occurred when the juvenile court determined M.D.'s competence to stand trial.
M.D. also claims that the evaluations addressing his competency were inadequate. The record clearly does not support this claim. As detailed in Part I of this opinion, the court ordered complete forensic evaluations by two psychologists and a supplemental evaluation of M.D.'s adaptive skills one of those psychologists. Both psychologists agreed that, in spite of M.D.'s low IQ score, he was able to aid in his defense and was competent to stand trial. Both experts acknowledged that M.D. had some communication difficulties, including limited vocabulary skills, but both indicated that M.D. could communicate with his attorney and others.
To the extent M.D. challenges the finding that he was competent to stand trial, we hold *64 that the court did not err in so finding. Rule 11.1, Ala. R.Crim. P.,[3] provides:
"A defendant is mentally incompetent to stand trial ... for an offense if that defendant lacks sufficient present ability to assist in his or her defense by consulting with counsel with a reasonable degree of rational understanding of the facts and the legal proceedings against the defendant."
We have held that a trial judge, who has the opportunity to observe and to listen to an appellant, is better situated than is this court to determine the appellant's competency to stand trial. Baker v. City of Huntsville, 516 So.2d 927, 931 (Ala.Crim.App.1987), quoting Anderson v. State, 510 So.2d 578, 580 (Ala. Crim.App.1987).
Our review of the record convinces us that the juvenile court did not err in determining that M.D. was competent to stand trial. As discussed in Part I of this opinion, the juvenile judge was fully aware of M.D.'s low IQ scores. Moreover, the record reflects that the court fully understood Dr. Rebert's testimony as it related to the initial determination of M.D.'s competency:
"[Court:] The test score is 48. Two people apparently from what you've asked have tested him at 48. I will give you that it's 48. Now, can we get on with the other factors that may have contributed to her saying that he's competent to stand trial. Because ... 48 is not going to be enough for me to say he's incompetent to stand trial. Because I've got an expert that's saying he is."
(R. II, 128-29.) The court stated that it would normally determine that a person with an IQ that low would be incompetent to stand trial (R. II, 131), but that because the experts testified that a low IQ alone does not render one incompetent, and because they determined that M.D. was competent, the court conducted further inquiry (e.g., "[T]ell me if you can specifically and generally how you arrived at the fact that even though he tests a 48 IQ on a[n intelligence] test that you believe he's competent to stand trial." (R. II, 132)). Dr. Rebert testified that she administered to M.D. the Competency to Stand Trial Assessment Instrument, which evaluates 13 areas related to competency to stand trial. (R. I, 19; II, 133.) Dr. Rebert explained that the 13 areas are an appreciation of the charge; an appreciation of the range and nature of the possible penalties; an appraisal of the likely outcome; an appraisal of the role of defense counsel, the prosecuting attorney, the judge, the jury, the defendant, and the witnesses; an understanding of court procedure; the capacity to disclose pertinent facts to defense counsel; the quality of relating to defense counsel; an appraisal of available defenses; the planning of legal strategy, including a possible guilty plea; the capacity to challenge realistically the prosecution witnesses; the existence of selfserving versus self-defeating motivations; whether behavior would be unmanageable in the courtroom; and the capacity to testify relevantly. (R.I, 23-34.) Dr. Rebert testified that M.D. indicated to her that he understood these concepts, that he could assist his counsel, and that he could participate meaningfully in his trial. (R. II, 133-39.)
Dr. Rebert and Dr. Rosecrans testified that M.D. was functioning at a level higher than his IQ score of 48 would indicate. Dr. Rebert's test of M.D.'s adaptive functioning did not clearly reveal to her that he was functioning in the subaverage range. (C. 89.) Dr. Rosecrans testified that he agreed with Dr. Rebert's determination that M.D. was competent and believed that M.D. could assist in his defense; in his report, Dr. Rosecrans stated that M.D. was functionally a slow learner to mildly retarded. (C. 108.)
The overwhelming evidence presented in this case supports the juvenile court's decision that M.D. was competent to stand trial. M.D. received thorough evaluations from two certified forensic examiners, who presented their test results and who were questioned extensively by the court and by M.D.'s counsel. They expressed no doubt that M.D. was competent to stand trial.
We have previously held that mental retardation, alone, does not require a finding that one is incompetent to stand trial. Gothard v. *65 State, 452 So.2d 889 (Ala.Crim.App.1984); Persons v. State, 339 So.2d 1092, 1094 (Ala. Crim.App.1976). Even so, after reviewing the briefs and hearing oral argument in the case, we initially believed that we would have to reverse the judgment of the court due to M.D.'s IQ score of 48. In light of the fact that the trial judge ordered two complete forensic evaluations and supplemental testing of M.D.'s adaptive functioning, that both mental health experts testified that M.D. was functioning at a level far above that reflected by his low IQ score, and that both mental health experts stated without equivocation that M.D. was competent to stand trial, we find that no error occurred in finding M.D. competent to stand trial. Moreover, we note that the juvenile judge in this case, who had the opportunity to observe M.D. during the hearings, acted with great caution by ordering supplemental evaluations, questioning the experts so that she fully understood them, and considering all of the evidence offered on this issue. This case again establishes that a low IQ, alone, does not prevent an accused from being competent to stand trial.

IV
M.D. alleges that Dr. Rosecrans' evaluation was based in part on his review of M.D.'s school records, which were not in evidence, and that this was a violation of Ex parte Wesley, 575 So.2d 127 (Ala.1990). M.D. has failed to preserve this issue for our review, because he failed to object when Dr. Rosecrans testified. Even in juvenile cases, a specific objection must be made in order to secure appellate review. P.W. v. State, 625 So.2d 1207, 1209 (Ala.Crim.App.1993). However, even if this issue had been preserved for our review, we would have found no error. Alabama appellate courts have repeatedly held that the strict rules of evidence do not apply in transfer hearings, and that hearsay testimony is properly admitted. E.g., M.W. v. State, 571 So.2d 361 (Ala.Crim. App.1990).

V
M.D. claims that the juvenile court erred in ordering his transfer to circuit court for prosecution as an adult because, he says, his physical and mental immaturity, his untreated mental problems, his prior record, and his minor role in this capital murder all demonstrate that his transfer was improper. We disagree.
The transfer of a juvenile for prosecution in the circuit court is governed by Ala.Code 1975, S. 12-15-34, which states, in pertinent part:
"(d) Evidence of the following and other relevant factors shall be considered in determining whether the motion [to transfer] shall be granted:
"(1) The nature of the present alleged offense;
"(2) The extent and nature of the child's prior delinquency record;
"(3) The nature of past treatment efforts and the nature of the child's response to such efforts;
"(4) Demeanor;
"(5) The extent and nature of the child's physical and mental maturity; and
"(6) The interests of the community and of the child requiring that the child be placed under legal restraint or discipline."
During the dispositional phase of the transfer hearing, the juvenile court is required to consider all of the foregoing factors, A.M. v. State, 623 So.2d 421 (Ala.Crim. App.1993), and the court's order must contain proof that each factor was considered when the court reached its decision, J.S.A. v. State, 615 So.2d 1288 (Ala.Crim.App.1993). The consideration of these factors involves more than a mere tallying; the juvenile court determines how much weight to give each factor as it balances the interests of the juvenile and of society. E.g., A.M. v. State, supra; A.D.T. v. State, 630 So.2d 165 (Ala. Crim.App.1993).
"When reviewing the disposition phase of a transfer hearing this court applies the `clear and convincing' standard. B.L.S. v. State, 628 So.2d 1034 (Ala.Cr.App.1993); A.D.T. v. State, 630 So.2d 165 (Ala.Cr.App. 1993); W.T.K. v. State, 598 So.2d 33 (Ala. Cr.App.1992) cert. denied, 506 U.S. 859, 113 S.Ct. 173, 121 L.Ed.2d 120 (1992)." *66 M.S.B. v. State, 651 So.2d 69, 71 (Ala.Crim. App.1994).
Application of the foregoing principles to M.D.'s case leads us to conclude, without question, that the juvenile court's decision to transfer M.D. is supported by clear and convincing evidence. As we have noted repeatedly, the juvenile judge in this case demonstrated that she understood that M.D. was limited intellectually,[4] but she also understood that his IQ score alone did not necessarily require commitment or preclude his transfer, because there was expert testimony that M.D. was functioning at a higher level than his IQ score alone would indicate. The record also reflects that, when the transfer decision was announced in court, the judge discussed fully the numerous factors involved here, including those enumerated in the statute. (R. III, 98-113.)
The court's transfer order states:
"The Court having reviewed the records and exhibits admitted in evidence, including the orders of this court, finds that said child has been referred to this court on April 23, 1994, Assault 2nd; May 16, 1994, Assault 3rd; September 8, 1994, Assault 3rd.
"The Court having considered all of the factors contained in Section 12-15-34, Code of Alabama, 1975, including the nature of the present alleged offense; the extent and nature of the child's prior delinquency record; the nature of past treatment efforts and the nature of the child's response to such efforts; demeanor; the extent and nature of the child's physical and mental maturity; and the interests of the community and of the child requiring that the child be placed under legal restraint or discipline finds that said child is not committable to an institution or agency for the mentally retarded or mentally ill; and further finds by clear and convincing evidence presented that the best interests of the child and public would be to grant the Motion to Transfer...."
(C. 56-57.) The juvenile court is vested with the discretion to weigh and balance these factors, and it is free to determine that one or more of the factors in support of the transfer outweigh the remaining factors that might not support transfer. Even though M.D. has a low IQ, is immature, and had an impoverished childhood, the evidence before the court also demonstrated that M.D. was armed with a pistol when he became an active participant in a robbery and a resulting capital murder; that he had previously assaulted others, including family members; that he was not mentally ill; and that he had not responded to past rehabilitative efforts. The court also stated that after considering the expert testimony, it was convinced that M.D. know the difference between right and wrong, but chose to act in ways that he knew were wrong. (R. III, 105-06.) The court noted that M.D. was at the very least an impulsive armed robber who was a danger to the community and found that the juvenile system was "not a place for M.D." (R. III, 109-11)
The transfer of M.D. to the Circuit Court of Jefferson County is supported by clear and convincing evidence, and that order is affirmed.
AFFIRMED.
All the Judges concur.
NOTES
[1] The Competency to Stand Trial Assessment Instrument evaluates 13 areas related to a defendant's competency to stand trial. For a more detailed description, see Part III of this opinion.
[2] Citations to the transcript of proceedings contain the volume number followed by the page number(s)R.I, 3-4. Citations to pages of the clerk's record are designated "C. ___".
[3] Rule 11, Ala. R.Crim. P., was substantially revised by an amendment effective October 1, 1996. This provision, however, was not changed by that amendment.
[4] The trial court suppressed M.D.'s confession, after considering Dr. Rebert's testimony that it was very unlikely that M.D. understood certain words contained in the Miranda warning unless those words were further explained. (R. III, 285-307.)