The prosecution grew out of a deplorable tragedy wherein the life of a thirteen year old boy was lost by having been struck by an automobile driven by this appellant. The appellant was convicted for murder in the second degree and sentenced to twenty years' imprisonment. Both here and in the trial court he is represented by court appointed counsel.
On the night of December 16, 1976, Mrs. Oma Jean Henderson and her four children were driving on Gaskin Road near the Alabama-Florida state line in Covington County. The left front tire on the automobile "blew out" and Mrs. Henderson pulled her car completely off the road. While she and her thirteen year old son, Hamilton Jackson (Jackie) Henderson, were changing the tire she noticed a car approaching behind them "a pretty good ways off". When Mrs. Henderson's fifteen year old daughter, Wanda, saw the automobile it was "a very good distance away" and she turned the headlights on. No one saw the actual crash as the automobile driven by the appellant rammed into the rear of the Henderson vehicle. Jackie Henderson was removing the spare tire from the trunk when the crash occurred and was killed instantly. *Page 912 
The Henderson vehicle was either pushed or knocked eighty feet down the road and turned sideways. The appellant's vehicle traveled sixty-eight feet after impact and ran off to the edge of the woods. The point of impact was determined to be three feet off the road. The road itself was a straight, unlined, two-lane county road. The evidence established that the appellant entered Gaskin Road at an intersection approximately one-half mile from the point of impact.
Mrs. Henderson was repelled away from her automobile by the collision. She sustained a broken leg and sent two of her children to seek help. Mrs. Henderson testified that she saw the appellant get out of his automobile and throw some bottles out of his car. She called to him and after two or three minutes he came over and asked if she was all right.
 "I said, `Yes, but you have killed my young'un'. He said, `No, I hadn't killed nobody'. So, I could smell the alcohol around him and I told him. I said, `You're drunk, ain't you'? He said, `No lady, I'm not drunk, but I'm gonna be drunk'. And I told him next time he put a beer to his mouth, I hoped he could see what he had done there tonight."
The appellant then went and lay down near the Henderson automobile.
Walter Kenneth Parrish saw the Henderson children walking down the road. He took them back to the wreck and radioed for help on his C.B. radio. He stated that the appellant was "walking up and down the highway", "in shock or something". Mr. Parrish "got hold of him and stood him beside the car" until the deputy sheriff arrived. Mr. Parrish did not smell any alcohol on the appellant's breath.
After returning with Mr. Parrish, Wanda Henderson spoke with the appellant. "He said he was sorry he hit us and I told him that I knew he was and I was sorry too." She testified that the appellant appeared drunk and intoxicated, "when he was standing he was sort of swaying and when he talked he sort of had a thick tongue, and she could smell alcoholic beverage on him".
Paxton City, Florida, Police Officer Robert Hilton and Walton County, Florida, Deputy Sheriff Jack Leonard Guinn were the first law enforcement officers on the scene. They arrived between 7:30 and 8:00 o'clock P.M. These officers laid the appellant on the ground "as a precaution". Both men talked to the appellant and neither smelled any alcohol on his breath though there was "an odor of some sort of alcoholic beverage" in the appellant's automobile.
An ambulance from the Tri-City Rescue Squad arrived and took the appellant and Mrs. Henderson to the Mizell Memorial Hospital in Opp, Alabama. In the ambulance, the appellant said that "he tried every way he could to keep from hitting that young'un".
Max Marsh, a member of the rescue squad rode in the ambulance with the appellant and Mrs. Henderson. Marsh stated that the appellant "appeared to know what was going on and everything." "He was in a shocked state also", was bleeding from his mouth. Four or five times he asked about the condition of the Henderson boy. Though Marsh rode next to the appellant in the ambulance, he did not smell any alcohol on the appellant's breath.
Wanda Lloyd, a nurse at the hospital, testified that the appellant "appeared to have been drinking", that she "felt like he had been drinking", and that she "thought she smelled liquor on his breath".
Alabama State Trooper Hubert Anderson testified that he requested that a blood sample be taken from the appellant. Four days after the crash, Anderson returned to the scene and found three bottles of beer and two broken beer bottles about ten to fifteen feet from where the appellant's car had stopped. He stated that the accident occurred around 7:50 P.M. He did not estimate the speed of the appellant's automobile but testified that the appellant "was traveling at a high rate of speed". Yet he could not state that the car was going as fast as fifty or sixty miles per hour.
Over defense objection, Dr. G.R. McCahan, Jr., a state toxicologist, was allowed to *Page 913 
testify to the results of a chemical analysis of a sample of the appellant's blood. McCahan stated that the alcoholic content of the appellant's blood was .13 per cent.
After the state rested its case and the trial court overruled defense counsel's motion to exclude the evidence, the appellant called his first witness.
Jimmy Wilkerson testified that the appellant came into his grocery store on Highway 331 between 5:00 and 5:30 P.M. on the day of the accident. Wilkerson stated that he smelled no alcohol on the appellant's breath and had no reason to believe that he had been drinking. The appellant took some pills at Wilkerson's store which the appellant said were "for diabetic purposes". He left around 6:00 o'clock P.M. From the store it would take the appellant about twenty to twenty-five minutes to get home. It was "considerably out of the way" for him to go home by the road on which the accident occurred but would then take thirty to thirty-five minutes. It should not have taken the appellant an hour to one hour and a half to arrive at the scene of the accident.
Dr. J.C. Dunn, a practicing physician in Opp, Alabama, examined the appellant at the hospital. The appellant was bleeding about the face and mouth and had some loose teeth. Dr. Dunn detected no evidence that the appellant had been drinking, found no outward signs of intoxication, and stated that the appellant could not talk very much on account of the injuries to his mouth.
Evidence presented by the defense revealed that the appellant had received a shot of Demerol and Vistaril at the Walton County Memorial Hospital around 11:30 o'clock on the morning of the accident for a headache. That morning the appellant had been to court concerning his divorce.
In rebuttal, state witness Don Mathews, an insurance adjuster, testified that he had investigated the accident and taken a statement from the appellant. The statement was admitted into evidence and corroborated the asserted fact that on the morning of the accident the appellant had been to court and then to the hospital for two shots for his headache. After receiving the shots the appellant went to his brother's house and slept all afternoon.
 "When I woke up I felt much better. I left my brother's home around 7:00 P.M., and drove to Wilkerson Service Station, located just west of Liberty Community, Florida; on U.S. Highway 331. I left the Service Station around 8:00 P.M., and drove north on U.S. Highway 331 for five (5) miles, where I turned right on the Gaskin, Florida highway. After traveling about one mile on the Gaskin Highway, my car was involved in an accident. I was knocked unconscious and did not come to until early the next morning in Mizell Memorial Hospital, Opp, Alabama. All that I can remember is that my car hit something, but I do not remember what. I do not remember whether I had been drinking any alcohol or not during the day."
 I
Initially the appellant contends that the trial court should have granted his motion to exclude the state's evidence for failure to prove a prima facie case of second degree murder.
It is settled that, in appropriate circumstances, a homicide committed by an intoxicated driver of an automobile may constitute murder in the second degree. Hyde v. State, 230 Ala. 243,160 So. 237 (1935); Langford v. State, 354 So.2d 297
(Ala.Cr.App.), reversed, 354 So.2d 313 (Ala. 1977); McGhee v.State, 333 So.2d 865 (Ala.Cr.App. 1976); Wright v. State,41 Ala. App. 684, 49 So.2d 835 (1963); Berness v. State,38 Ala. App. 1, 83 So.2d 607, affirmed, 263 Ala. 641, 83 So.2d 613
(1953); Williams v. State, 30 Ala. App. 437, 7 So.2d 511 (1942);Reed v. State, 25 Ala. App. 18, 142 So. 441, cert. denied,225 Ala. 219, 142 So. 442 (1932).
The argument that the gross negligence or wanton misconduct of the driver of an automobile causing the death of another constitutes either murder in the first degree or manslaughter but not second degree murder was rejected by the Alabama *Page 914 
Supreme Court in Reed v. State, 225 Ala. 219, 142 So. 441
(1932) (see dissent of Anderson, C.J.).
Second degree murder is defined as the unlawful killing of a human being with malice, but without deliberation or premeditation. Miller v. State, 145 Ala. 677, 48 So. 47 (1906). In order to authorize a conviction for murder in the second degree for a homicide caused by the driving of an automobile, the evidence must be sufficient to warrant a finding by the jury that the accused either intentionally caused the collision or that he
 "was conscious of his acts, conscious of the impending danger surrounding him, and of the probable results of his acts, and then with a reckless indifference to the probable consequences of his acts, brought about the collision and death of the deceased." Hyde, 230 Ala. at 244, 160 So. at 238.
See also Williams, 30 Ala. App. at 439, 7 So.2d 511.
A specific intent to kill is not essential to second degree murder. Fowler v. State, 155 Ala. 21, 45 So. 913 (1908); Baileyv. State, 133 Ala. 155, 32 So. 57 (1902); Titus v. State,117 Ala. 16, 23 So. 77 (1898).
 "It is not necessary that there was an intent to kill to constitute murder in the second degree. It is sufficient if the defendant voluntarily set in motion or applied an unlawful force from which death ensued, however free the action may be from actual purpose to kill." Smith v. State, 154 Ala. 31 at 34, 45 So. 626
at 627 (1908).
Nor is it necessary that the defendant should have entertained the intent to do an unlawful act or that he should have his mind fixed upon the unlawful quality of the act he intended to do. "It was enough that he intended to do what he did, if that was unlawful." Tucker v. State, 202 Ala. 5 at 6, 79 So. 303 at 304 (1918).
Murder in the second degree includes those cases which are not accompanied with the intent to take life but are committed by gross carelessness.
 "A killing may also be reckless, without evincing a purpose to take the life of any particular human being, and without evincing the degree of depravity shown in the illustrations we have mentioned.[1] There may be no purpose to do mischief, as if one from a house-top recklessly throws down a billet of wood upon the sidewalk, where persons are constantly passing, and it fall upon a person passing by and kill him. Moore v. State, 18 Ala. 532." Fields v. State, 52 Ala. 348 at 354 (1875).
Malice is a necessary element of murder in the second degree and is the factor which distinguishes second degree murder from first degree manslaughter. Roberson v. State, 183 Ala. 43,62 So. 837 (1913); Smith v. State, 31 Ala. App. 12, 11 So.2d 466, cert. denied, 243 Ala. 627, 11 So.2d 473 (1943). It was a settled principle of common law that where death ensues from an act done without lawful purpose, dangerous to life, malice is implied. Clarke v. State, 117 Ala. 1, 8, 23 So. 671 (1898).
A second degree murder conviction has been sustained where the evidence indicated that the driver of the automobile was intoxicated or under the influence of whiskey, while traveling at a speed of forty to sixty-five miles per hour on the streets of Birmingham, turned a corner and the car struck and killed the deceased who was walking on the sidewalk, the car having climbed the embankment of the sidewalk which was several feet higher than the street and dragged the deceased some sixty to sixty-five feet. Reed, supra. The evidence was also sufficient to support a conviction for second degree murder where the *Page 915 
intoxicated driver of an automobile traveling at a speed of fifty miles per hour ran his car into the rear of two cars traveling in front of him and then pulled or swerved his car across the highway and ran into the automobile driven by the deceased. Williams, supra. In Hyde, supra, the conviction was sustained where the accused, under the influence of whiskey, overtook and passed the car driven by the deceased and "without reason or excuse" whipped his car across and immediately in front of the deceased, zig-zagging his car from one side of the road to the other until he hit the deceased's car in the rear. In Berness, supra, the accused was convicted of second degree murder where the evidence disclosed that he and the driver of the accused's automobile were both intoxicated and their car struck and killed a young woman who was walking about four feet off the paved portion of the highway, in the same direction as the accused's automobile was moving, but on the opposite side of the highway so that it was necessary for the automobile to cross the entire highway and go onto the shoulder of the road in order to strike the girl. Second degree murder convictions have also been sustained where the accused and another were racing each other when the deceased was killed, Wright, supra, and where the accused intentionally ran over the deceased.Blackwell v. State, 264 Ala. 553, 88 So.2d 347 (1956).
The evidence in this case discloses that the appellant while legally intoxicated (.13%) plowed into the rear end of a vehicle parked completely off the paved portion of the straight but unmarked county road. The point of impact was determined to be three feet from the edge of the road. The collision occurred at night and the jury had evidence to support a finding that the parked automobile had its lights on and was clearly visible to an approaching motorist. The appellant was traveling at a rate of speed which was undetermined but with enough velocity to either push, drag or knock the parked vehicle, the transmission of which was in "park" and with a flat left front tire, approximately eighty feet down the road. The appellant's car then veered off to the right and continued some distance until it stopped near the edge of the woods. The jury could also find that after the collision the appellant threw five beer bottles from his automobile. Under this factual situation the jury was justified in convicting the appellant of murder in the second degree.
Furthermore there is additional evidence which would tend to show that utter disregard of human life sometimes characterized as malice. Proof was presented that the appellant received a shot of Demerol and of Vistaril approximately seven hours before the homicide, that these drugs could produce drowsiness and could increase the effects of alcohol for six to eight hours. Dr. Dunn, a defense witness, testified on cross examination that if he gave a man a shot of Demerol, he would not even let him drive home and he would caution the patient against the use of alcoholic beverages after taking Demerol. Jimmy Wilkerson testified that the appellant took some white pills before he left his grocery store. Whether this additional evidence exculpated the guilt of the appellant as the defense apparently thought it would, or whether it in fact further incriminated him was a valid question for the jury. The consumption of a quantity of liquor or beer after the previous ingestion of some "pills" and other medication coupled with the willful operation of an automobile may constitute evidence of recklessness and disregard of human life.
This court is ever mindful that
 "(t)he deeply deplorable and tragic accident, its heart-rending results, of itself, cannot be made the basis or premise from which the acts of the accused should be determined or his guilt adjudged. That must be ascertained and determined solely from the evidence upon the trial as to the occurrence complained of." Lay v. State, 26 Ala. App. 458 at 459, 162 So. 319 (1935).
Yet we cannot state as a matter of law that the evidence was insufficient to support a conviction for murder in the second degree. *Page 916 
 II
The appellant contends that the trial court erred in allowing into evidence the results of a chemical test for intoxication without requiring as a predicate for its admission a certified copy of the regulations of the State Department of Health showing the approval of the test used and the procedures to be followed in conducting the test. It is also argued that the trial judge committed error in charging the jury on the statutory presumptions of intoxication arising from the amount of alcohol in the blood because a proper predicate was not established for the initial introduction of the test results.
In Alabama, evidence concerning chemical tests to determine alcoholic influence is admissible under Section 32-5-193, Code of Alabama 1975:
 "(a) Upon the trial of any civil or criminal action
or proceeding arising out of acts alleged to have been committed by any person while driving a vehicle while under the influence of intoxicating liquor, the amount of alcohol in the person's blood at the time of the chemical test or tests authorized by this division as shown by chemical analysis of the person's blood, urine or breath shall be admissible as evidence and give rise to the following presumptions."
* * * * * *
 "(b) Chemical analyses of the person's blood, urine or breath to be considered valid under the provisions of this section shall have been performed according to methods approved by the state board of health and by an individual possessing a valid permit issued by the state board of health for this purpose."
(Emphasis added)
In Patton v. City of Decatur, Alabama, 337 So.2d 321 (1976), the Alabama Supreme Court noted:
 "Nowhere is it shown that duly adopted methods or regulations of the State Board of Health were followed in administering the [P.E.I.] test. The trial court therefore had before it no certified methods promulgated by the Board of Health for the administration of the test and consequently was unable to ascertain standards against which the evidence could be measured."
* * * * * *
 "But our inability to ascertain the validity of the results obtained from a technologically sophisticated device due to questionable operator technique, demonstrates the absolute necessity for written procedural methods governing its use. In this regard, unwritten standards of the Board of Health are no better than no standards at all. See Sun Ray Drive-In Daisy, Inc. v. Oregon Liquor Control Comm., 16 Or. App. 63, 517 P.2d 289 (1973). The need for written standards becomes particularly acute where, as here, a finding of criminal conduct may well turn upon adherence to and rigid compliance with such standards."
* * * * * *
 "Accordingly, in passing on a conviction which was based in part on the results of a P.E.I. test, the only concern of this court is to ascertain whether the will of the legislature has been obeyed. We hold that an affirmative response to that inquiry cannot follow where there are no written standards governing the manner in which P.E.I. tests are to be performed by state law enforcement agencies."
 "It would be a simple matter to profess a duly certified and authenticated copy of methods or regulations duly adopted or approved by the State Board of Health. When such copy is admitted in evidence, then the proponent could ask the witness predicatory questions." 337 So.2d 324-325.
The Alabama Chemical Text for Intoxication Act (Now §§ 32-5-190
through 32-5-194, Code of Alabama 1975) makes no distinction in requiring that a blood, breath, or urine test be performed according to methods approved by the State Board of Health. §32-5-193 (b). The state's argument that the logic of the Patton
opinion does not apply where the test administered was a blood test is without statutory support. If *Page 917 
the state is to use the statutory presumptions of intoxication and the jury is to be charged on those presumptions, it is mandatory under the terms of the statute that the "chemical analyses of the person's blood, urine or breath to be considered valid . . shall have been performed according to methods approved by the state board of health". § 32-5-193 (b).
There is no rebuttable presumption that a duly licensed operator knew and used methods and techniques approved by the state board of health in administering the test. This argument was specifically rejected in Patton v. City of Decatur, Ala.Cr.App., 337 So.2d 173 at 176, reversed, Ala.,337 So.2d 321 at 323-324 (1976).
In this case Toxicologist G.R. McCahan, Jr. testified, among other things, that he was currently licensed by the Department of Public Health to perform "chemical analysis of blood and/or urine specimens pursuant to the Alabama Chemical Tests for Intoxication Act"; that he was specially trained before becoming certified; that he used a test called "the gas chromatograph head space type of test" which is "one of the tests that is allowable by the State Health Department". McCahan described the manner in which the test was conducted and the steps taken to insure accuracy. Defense counsel objected to this testimony "until we have the state regulations proved pursuant to which he is proceeding". The trial judge overruled the objection because "it's in the Code. I don't think you have to prove it." * * * "Well, I think we have satisfactorily proved that he is an expert." However there was no testimony or proof that the manner in which the test was conducted was performed according to methods approved by the state board of health. The fact that the test operator was an expert or was duly certified provides no basis for any presumption that the test was correctly performed. Patton, supra; Weaver v. City of Birmingham, Ala.Cr.App., 340 So.2d 99
(1976).
While it was unnecessary for the prosecution to resort to a chemical test in order to make out a prima facie case of vehicular homicide, Patton, 337 So.2d at 324, the results of the test played an extremely important part in the state's burden of proving the requisite degree of reckless and wanton conduct necessary to support a conviction for murder in the second degree. The evidence of intoxication was conflicting and under the circumstances the result of the test was extremely prejudicial to the appellant. This error was basic and fundamental and requires that the judgment of conviction be reversed.
 III
The judge charged the jury on homicide and malice as follows:
 "Malice in everyday use, probably is understood by most people to mean hatred or ill will, but malice in the law, and as used in the definition of murder, does not necessarily mean ill will or hatred. But it means an unlawful act, willfully done, without just cause or legal excuse. And that is the key to the definition of malice as just cause or legal excuse. Perhaps the best way to explain that term to you would be to give you an example. Just cause or justifiable homicide would be one in which a person acts in self-defense and takes another's life in defense of himself or his home or another person. A legal excuse is an accident, pure and simply an accident. That's any homicide that results from an accident would be one with legal excuse. There is another principle of law pertaining to murder and our Courts have said this many times. I want to read you this statement from our Appellate Courts. `One killing another by an act greatly dangerous to other's lives and evidencing a depraved mind regardless of human life, although without preconceived purpose to kill any particular person is guilty of murder.'
 "So you would have to find before you could find this Defendant guilty of murder in the second degree, you would have to find the existence of malice as I have defined that term to you or a depraved *Page 918 
mind without regard to human life, as I have just read that statement to you."[2]
Defense counsel objected to the trial court's charge on malice
 "because I feel like it may not have been clear that you have got to intend harm to someone before you can have malice. And just being reckless is not enough in itself. There is a difference between recklessness and malice. It takes more than that and I am not sure satisfied that they understand that. And that's all."
The appellant argues that the trial court's charge as to reckless conduct evidencing a depraved mind amounts to an effort to classify the fourth category of first degree murder as a proper basis for a conviction of second degree murder; that the charge to the effect that a finding of reckless conduct evidencing a depraved mind as an alternative to a finding of malice was error; that the trial court did not properly explain the meaning of malice for purposes of second degree murder and to distinguish second degree murder from manslaughter in the first degree; and that the charge totally failed to instruct the jury that "a consciousness of impending danger, and a conscious doing of acts with reckless indifference to the probable consequences is the essence of malice necessary for murder in the second degree".
 A.
The trial court's definition of malice was proper and was approved in Lowery v. State, 294 Ala. 347, 317 So.2d 360
(1975). Other authorities state:
 "Malice aforethought cannot be given a literal interpretation and has acquired a strictly technical definition and comprehends a number of different conditions of mind. It is said to include all those states and conditions of mind which accompany a homicide committed without legal excuse or extenuation. Malice aforethought may be regarded as the mental state of a person voluntarily doing an act which ordinarily will cause serious injury or death to another without excuse or justification. While actual hatred or enmity may be present, malice is not limited in its meaning to hatred, ill will, or malevolence. Moreover, malice aforethought may exist although there is no particular enmity or ill will toward the victim and even though there is no specific intent to take human life.
 "If the defendant had voluntarily committed an act which in the ordinary course of events would or might cause death or serious bodily harm, he is liable for murder although he did not actually intend that death should follow."
* * * * * *
 "Malice as an essential characteristic of the crime of murder may be either express or implied."
* * * * * *
 "Express malice is defined as an intent either to kill or do serious bodily harm or with reckless disregard of the consequence of the act, to do any cruel act which results in death."
* * * * * *
 "Generally, however, implied malice may be regarded as the equivalent of the phrase `constructive malice'. That is, malice as such does not exist but the law regards the circumstances of the act as so harmful that the law punishes the act as though malice did in fact exist." R. Anderson, Wharton's Criminal Law and Procedure, §§ 242, 244, 245 (10th ed. 1957). *Page 919 
In this state, second degree murder embraces those homicides in which malice was implied at common law and also those attended with evidences of express malice. Fields, 52 Ala. at 352.
Because the condition of a man's mind or heart is rarely the subject of direct and positive proof,
 "Malice is said to be implied where there is no deliberate mind and formed design to take life, but where the killing, nevertheless, is done without justification or excuse, and without provocation, or without sufficient provocation to reduce the offense to manslaughter. It is sometimes said that malice is implied where no considerable provocation appears, or where all the circumstances show an abandoned or malignant heart. However, it is not necessary that this condition of mind or heart be characteristic of the slayer; malice, in its legal sense, may exist without actual intention of any mischief, if the killing is the actual consequence of the commission of an act, capable of doing great bodily harm, so carelessly, recklessly, or wantonly as to evidence depravity of mind and disregard for human life, although there is no actual design or intention to encompass death." 40 Am.Jur.2d, Homicide § 51.
There can be no doubt that malice can be implied or presumed from the reckless, wanton, and gross carelessness with which a motor vehicle is operated.
 B.
In Nixon v. State, 268 Ala. 101 at 103, 105 So.2d 349 at 350 (1958), the portion of the oral charge under review stated
 "Our courts have said that where the accused is himself the driver of an automobile and drives in a manner greatly dangerous to the lives of others so as to evidence a depraved mind regardless of human life he may be guilty of murder in the second degree, if his anti-social act results in death of another, and this though he had no preconceived purpose to deprive any particular human being of life. Under such circumstances his acts are unlawful and without legal excuse, and malice may be inferred therefrom."
This was held to be an incorrect definition of murder in the second degree although it was substantially identical with a statement in the opinion of Berness v. State, 38 Ala. App. 11 at 3, 83 So.2d 607 (1953).
 "As used in that opinion (Berness) the statement did not undertake to state a correct charge on, or even a definition of, murder in the second degree. The statement was a premise to consideration of one of the questions in that case, which was whether or not a defendant could be convicted of murder in the second degree when another was driving the car with defendant's authorization and defendant was present in the car."
The court noted that this charge defined as second degree murder the same offense which § 314 of Title 14, Code of Alabama 1940, Recompiled 1958, declares to be first degree murder.
 "While a defendant charged with first degree murder may be convicted of second degree murder, the definitions for both degrees cannot be the same. (This) . . . portion of the oral charge is also an incorrect statement of the law." Nixon, 268 Ala. at 106, 107, 105 So.2d at 354.
In the instant case the oral charge of the trial court is guilty of the same fault. The trial judge did define murder in the second degree as the same offense which is declared first degree murder by statute.
However this portion of the charge, though erroneous, did not prejudice the appellant and was harmless error. The appellant though indicted for first degree murder could only be convicted of second degree murder because the state elected to prosecute for murder in the second degree and the court so charged the jury. The jury was only given the proposed forms for verdicts of murder in the second degree and first and second degree manslaughter.
The application without further explanation of the standard definitions of murder in the second degree and both degrees of *Page 920 
manslaughter to a factual situation involving a homicide caused by the wanton and reckless operation of an automobile involves some difficulty and lends confusion to the issues. A proper definition of the elements of murder in the first degree in a charge of vehicular homicide may be found in Langford v. State,354 So.2d 313 (Ala. 1978) and State v. Massey, 20 Ala. App. 56,100 So. 625 (1924). See also Napier v. State, 357 So.2d 1001
(Ala.Cr.App.), reversed, 357 So.2d 1011 (Ala. 1978). Throughout this opinion we have attempted to explain the elements of second degree murder. The opinion in Hanby v. State,39 Ala. App. 392 at 397, 101 So.2d 553 (1957), reversed on other grounds, 267 Ala. 69, 101 So.2d 562 (1958), approves an oral charge as adequately defining manslaughter in the first degree. A correct charge on second degree manslaughter may be found inAllen v. State, 30 Ala. App. 423 at 424, 7 So.2d 91 (1942), though an oral charge that simple negligence contributing to the death of a human being constitutes involuntary manslaughter was held unobjectionable in Little v. State, 339 So.2d 1071
(Ala.Cr.App.), cert. denied, 339 So.2d 1073 (Ala. 1976).
 IV
The instance given rise to the final assertion raised on appeal occurred in closing argument:
 "MR. STOKES (Defense Counsel): There is absolutely no evidence whatsoever that has been put on this stand yesterday or today to justify anybody even considering Mr. Commander being guilty of second degree murder. It requires malice, malicious killing of another human being. The Judge is going to define for you what it takes to constitute malice and that sort of thing but malice is required in some form. I think it is very plain that Mr. Commander is sorry that he got into this accident. He didn't intend the accident.
"MR. COOK: We object to that.
"THE COURT: Yes.
 "MR. COOK: There has been no evidence of what he intended.
"THE COURT: Yes, I sustain.
 "MR. COOK: Or that he was sorry or anything like that.
"MR. STOKES: I believe that. . . .
"THE COURT: Yes, I sustain."
The appellant contends that the ruling of the trial judge was unduly restrictive of defense counsel's closing argument.
Generally evidence which justly tends to exculpate the accused or to reduce the grade of the offense is admissible in a prosecution for the death of a person killed by or because of the operation of a motor vehicle. Sashington v. State,56 Ala. App. 698, 325 So.2d 205, cert. denied, 295 Ala. 416,325 So.2d 211 (1975).
The evidence that the appellant was "sorry" and did not intend the accident was admitted without objection by the state during the course of the trial. Regardless of whether or not this evidence was admissible, Coates v. State, 253 Ala. 290 at 295, 45 So.2d 35 (1950); Shaneyfelt v. State, 41 Ala. App. 130,124 So.2d 466 (1960), once it was admitted without objection, it became subject to comment by counsel. Where evidence which was illegal and irrelevant was not objected to when offered, and was allowed to remain before the jury, it is competent for counsel on either side to refer to it or comment on it in argument before the jury. Osborn v. State, 125 Ala. 106,27 So. 758 (1900); Conley v. State, 354 So.2d 1172 (Ala.Cr.App. 1977). See also Roberts v. State, 346 So.2d 472 (Ala.Cr.App.), cert. denied, 346 So.2d 478 (Ala. 1978). Defense counsel should have been permitted to comment upon the evidence of the intention of the defendant admitted without objection.
As much as we regret the result of this case on appeal, the worst wretch that walks the earth is entitled to a fair trial.Watts v. State, 282 Ala. 245 at 248, 210 So.2d 805 (1968). Because of the errors committed in the trial court the appellant has been denied a fair trial. Of necessity, therefore, the judgment of conviction must be reversed and the cause remanded.
REVERSED AND REMANDED.
All Judges concur.
[1] With reference to the fourth class of murder in the first degree (depraved heart — universal malice) the court noted that:
 "Illustrations given in the common law books of the reckless depravity which at common law imported malice and which is the equivalent of malice, directed to a particular person are `the going deliberately, and with intent to do mischief, upon a horse used to strike, or cooly discharging a gun among a multitude of people'." Fields, 52 Ala. at 354.
[2] The trial court also charged:
 "Murder in the Second Degree is the unlawful killing of a human being with malice or forethought, but without deliberation or premeditation. . . . Manslaughter in the First Degree is the unlawful killing of another without malice either expressed or implied, which may be either voluntary or upon a sudden heat or involuntary, but in the commission of some unlawful act. And Manslaughter in the Second Degree is described as the unlawful killing of a human being without malice, either express or implied and without intent to kill or inflict an injury causing death, committed accidentally in the commission of some unlawful act and not felonious or in an improper and negligent performance of an act lawful within itself." *Page 921