SHAW, Judge.
Christopher Wayne Lum was convicted in the Brewton municipal court of driving under the influence of alcohol (“DUI”), a violation of § 32-5A-191(a), Ala.Code 1975.[1] He appealed to the circuit court for a trial de novo and was again convicted of DUI. The trial court sentenced Lum to 10 days in the county jail, but suspended the sentence and placed him on probation for 2 years.[2]
The evidence adduced at trial indicated the following. On April 17, 2002, at approximately 2:00 a.m., Carney Lee Fillmore, a patrol officer with the Brewton Police Department, was traveling on U.S. Highway 31 when he noticed a vehicle at a gasoline station. According to Officer Fillmore, the vehicle went over the curb near the gasoline pumps and then proceeded onto the highway without stopping. Officer Fillmore followed the vehicle and noted that it was traveling approximately 55 miles per hour in a 40-mile-per-hour zone. Officer Fillmore then stopped the vehicle for a traffic violation.
When Officer Fillmore approached the vehicle, he saw that there were three occupants; Lum was the driver. Officer Fillmore also noticed an odor of alcohol emanating from the vehicle. Officer Fillmore testified that he asked Lum to get out of the vehicle and that Lum did so, but with difficulty. According to Officer Fillmore, Lum had to lean against the vehicle to keep his balance as he got out. In addition, Officer Fillmore said that Lum’s speech was slurred, his face was flushed, his eyes were glassy and red, and he was unable to focus. When asked how much he had had to drink, Lum told Officer Fillmore that he had had one beer. Officer Fillmore testified that he then administered two field-sobriety tests, both of which Lum failed.[3] Officer Fillmore then *243 arrested Lum for DUI and transported him to the police station. At the police station, Officer Fillmore administered the Draeger Aleotest 7110 MK III-C (“Drae-ger”) breath test; the results indicated that Lum’s blood-alcohol level was 0.08 percent.
I.
Lum contends that the trial court erred in allowing the City to introduce into evidence the Draeger test result because, he says, the City failed to lay a proper predicate for its admission. Specifically, he argues that the City failed to establish that the test was performed according to methods approved by the Department of Forensic Sciences (“the Department”), as required by § 32-5A-194(a)(l), Ala.Code 1975; section 32-5A-194(a)(l) provides:
“(a) Upon the trial of any civil, criminal or quasi-criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual control of a vehicle while under the influence of alcohol or controlled substance, evidence of the amount of alcohol or controlled substance in a person’s blood at the alleged time, as determined by a chemical analysis of the person’s blood, urine, breath or other bodily substance, shall be admissible. Where such a chemical test is made the following provisions shall apply:
“(1) Chemical analyses of the person’s blood, urine, breath or other bodily substance to be considered valid under the provisions of this section shall have been performed according to methods approved by the Department of Forensic Sciences and by an individual possessing a valid permit issued by the Department of Forensic Sciences for this purpose. The court trying the case may take judicial notice of the methods approved by the Department of Forensic Sciences. The Department of Forensic Sciences is authorized to approve satisfactory techniques or methods, to ascertain the qualifications and competence of individuals to conduct such analyses, and to issue permits which shall be subject to termination or revocation at the discretion of the Department of Forensic Sciences. The Department of Forensic Sciences shall approve permits required in this section only for employees of state, county, municipal, and federal law enforcement agencies and for laboratory personnel employed by the Department of Forensic Sciences.”
(Emphasis added.) According to Lum, the City failed to present any evidence indicating that the Draeger device used in his case had been certified before it was put into service and recertified annually thereafter or that it had been electronically inspected every six months since it was put in service. To support his claim that annual certification and semiannual inspection are a necessary part of the statutory predicate for admission of test results from the Draeger, Lum relies on the following regulation of the Department:[4]
*244 “370-1-1-.02 Evidential Breath Alcohol Testing Instrument Inspections.
[[Image here]]
“(2) Each Draeger Alcotest 7110 MK III[5] shall be certified by the Department of Forensic Sciences Technical Director or his designee prior to being placed in operation. Each Draeger Al-cotest 7110 MK III shall be electronically inspected at least once every six calender months by the Department of Forensic Sciences Technical Director or his designee. Each Draeger Alcotest 7110 MK III shall be recertified by the Department of Forensic Sciences Technical Director or his designee at least once a calendar year.”
Ala. Admin. Code (Dep’t of Forensic Sciences), Regulation 370-1-1-.02.
The City argues that certification and inspection of the Draeger device are not part of the statutory predicate pursuant to § 32-5A-194(a)(l) for admission of the test results because, it says, the annual certifications and semiannual inspections of the Draeger device are not considered part of the “methods” approved by the Department. According to the City, the “methods” referred to in § 32-5A-194(a)(l) are contained in Reg. 370-1-1-.01 of the regulations of the Department, not in Reg. 370-1-1-.02. The Department, which filed an amicus curiae brief addressing this issue, also argues that the “methods” referred to in § 32-5A-194(a)(l) are contained in Reg. 370 — 1—1—.01, and not in Reg. 370-1-1-.02. At the time Lum was convicted, Reg. 370-1-1-.01 provided,[6] in part:
“370 — 1—1—.01 Evidential Breath Alcohol Testing.
“(1) Qualifications. Applicant must have satisfactorily completed the course in the theory and operational procedures of the breath alcohol testing instrument and be an employee for one of the agencies listed in Section 32-5A-194 Code of Alabama, 1975 as amended.
“(2) Certification Permits.
“(a) Permits to perform chemical analysis of a person’s breath pursuant to the Alabama Chemical Test for Intoxication Act will be issued by the Director of the Department of Forensic Sciences and certified by the Technical Director of the Department of Forensic Sciences.
[[Image here]]
“(3) Approved Evidential Breath Alcohol Testing Instrument List.
“(a) The following Evidential Breath Alcohol Testing Instruments are approved.
“1. Intoxilyzer 5000, CMI, Inc., Ow-ensboro, KY.
“2. Alcotest 7110 MK III, Draeger Safety, Inc., Durango, CO.
“(4) Methods Approved by the Alabama Department of Forensic Sciences.
“(a) Intoxilyzer 5000. The approved procedure, technique or method of operation appears on the Intoxilyzer 5000 Operational Procedure Card.
“(b) Draeger Alcotest 7110 MK III. The approved procedure, technique or method of operation resides in the software of the Draeger Alcotest 7110 MK *245 III. The procedure requires the operator to input the following clerical data as prompted in order to initiate the test sequence.... Omission of an entry in any field will prevent the completion of the test.
“1. Permit Number. The operator must enter his permit number.
“2. <1> DUI <2> ADMIN <3> DEMO. The operator must select the type of test to be administered.
“3. Enter Dry Gas Standard # 1 Pressure. The operator must observe and record the pressure from the gas regulator gauge on bottle # 1.
“4. Enter Dry Gas Standard # 2 Pressure. The operator must observe and record the pressure from the gas regulator gauge on bottle # 2.
“5. Twenty Minute Deprivation Period. The operator must confirm that the subject has been under the control of the arresting officer and/or the operator for a minimum of 20 minutes. Enter T’ for yes or ‘N’ for no.
“6. Arresting Officer Same As Operator. The operator must designate whether the breath test operator is or is not the arresting officer. Enter TP for yes or ‘N’ for no. If the arresting officer is not the breath test operator then the following information on the arresting officer will also be required.
“(i) Arresting Officer’s Last Name. The operator must enter the last name of the arresting officer.
“(ii) Arresting Officer’s First Name. The operator must enter the first name of the arresting officer.
“(in) Arresting Officer’s Middle Initial. The operator must enter the middle initial of the arresting officer.
“(iv) Arresting Officer’s Identification Number. The operator must enter the badge number of the arresting officer.
“(v) Arresting Officer’s Agency. The operator must enter the agency name of the arresting officer.
“7. Date of Offense. The operator must enter date of offense using the format <MM/DD/YYYY>.
“8. Time of Offense. The operator must enter the approximate time of offense using military time designation. When the difference between the time of the offense and the real time is less than twenty minutes the unit will purge the system and abort the test.
“9. County of Offense. The operator must enter the county in which the offense occurred.
“10. Subject’s Uniform Traffic Complaint Number. The operator must enter the subject’s Uniform Traffic Complaint Number.
“11. Subject Last Name. The operator must enter the subject’s last name.
“12. Subject First Name. The operator must enter subject’s first name.
“13. Subject Middle Initial. The operator must enter subject’s middle initial.
“14. Subject Street Address/Apartment. The operator must enter subject’s street address or apartment address.
“15. Subject Town/City. The operator must enter subject’s town or city of residence.
“16. Subject State. The operator must enter subject’s state of residence using the appropriate two letter designation.
“17. Subject Driver License or Social Security Number. The operator must enter subject driver’s license, social security number of Alabama I.D. number.
■ “18. Subject <Male/Female>. The operator must designate the subject’s *246 gender using ‘M’ for male and ‘F’ for female.
“19. Subject Date Of Birth. The operator must enter the subject’s date of birth using the format <MM7 DD/YYYY> or <MM/DD/YY>. An entry of 01/01/1900 will be used when the subject’s date of birth cannot be obtained.
“(5) Report of Breath Alcohol Test Result.
[[Image here]]
“(b) Draeger Alcotest 7110 MK III. For purposes of this regulation two (2) acceptable samples of breath shall constitute a breath alcohol test.
“1. The Draeger Alcotest 7110 MK III is programmed to require a second sample of breath be tested no less than two (2) minutes and not more than fifteen (15) minutes after the first sampling. The two samples must agree within +/-0.020 grams of ethanol per 210 liters of breath. If the two samples do not agree within +/-0.020 grams of ethanol per 210 liters of breath, the instrument is programmed to begin a second breath alcohol test procedure. The instrument will prompt the operator to have the subject provide two (2) additional samples of breath. Failure to provide two (2) acceptable samples of breath for the second breath alcohol test procedure will constitute a refusal of the whole test. The lowest of the breath alcohol results from the' completed breath alcohol test procedure will be reported. A record of the breath alcohol results from the breath alcohol test will be stored in the electronic memory. The Alcotest 7110 MK III is programmed to generate a Certifícate of Breath Alcohol Analysis.
“2. A complete breath alcohol test procedure shall incorporate two (2) calibration checks to verify the calibration of the Draeger Alcotest 7110 MK III. A 0.020 grams of ethanol per 210 liters of breath calibration check shall precede and a 0.080 grams of ethanol per 210 liters of breath calibration check shall follow each set of duplicate subject samples. The Draeger Alcotest 7110 MK III must produce a reading between 0.015 grams of ethanol per 210 liters of breath and 0.025 grams of ethanol per 210 liters of breath inclusive when a 0.020 grams of ethanol per 210 liters of breath calibration check vapor is introduced into the instrument to pass the calibration check. The Draeger Alcotest 7110 MK III must produce a reading between 0.076 grams of ethanol per 210 liters of breath and 0.084 grams of ethanol per 210 liters of breath inclusive when a 0.080 grams of ethanol per 210 liters of breath calibration check vapor is introduced into the instrument to pass the calibration check. The Alcotest 7110 MK III will discontinue the test sequence if the acceptable range for the 0.020 grams of ethanol per 210 liters of breath calibration check or the 0.080 grams of ethanol per 210 liters of breath calibration check is exceeded. ‘Calibration Checks Before and After Test — OK’ will be noted on the Certifícate of Breath Analysis to indicate the criteria for an acceptable calibration check was met.
“3. An internal diagnostic check is performed by the Draeger Alcotest 7110 MK III one hundred twenty eight (128) times per second. The Draeger Alcotest 7110 MK III will store in memory a record of the diagnostics test performed at the beginning and end of each test sequence. ‘Diagnostic Checks Before and After Test — OK’ will be noted on the Certificate of Breath Alcohol Analysis to indicate that no malfunction was detected.”
*247 At trial, Officer Fillmore testified that the Draeger was the breath-testing device approved by the City of Brewton, and that he had been trained to operate the Drae-ger and had been issued a permit by the Department to operate the Draeger.[7] Officer Fillmore testified that he followed the normal procedure for administering a Draeger breath test when he administered the test to Lum. Specifically, Officer Fillmore said that he subjected Lum to a 20-minute deprivation period before Lum gave a breath sample, during which Lum was not allowed to eat or drink anything;[8] that he typed in all the relevant information for the testing sequence; that the device performed its internal calibration and diagnostic checks and indicated on the “Certificate of Breath Alcohol Analysis” that the checks both before and after the test were satisfactory; and that the test indicated that Lum’s blood-alcohol level was 0.08 percent. Officer Fillmore also testified that the Draeger device reports only the lowest result from two breath samples. During Officer Fillmore’s testimony, the City introduced into evidence the “Certificate of Breath Alcohol Analysis.” (C. 74.) The document lists all the information regarding the subject of the test and regarding the operator of the machine that is required to be typed into the device pursuant to Reg. 370-1-1-.01(4)(b). In addition, although the operator only inputs his or her permit number, the document, apparently based on the software programming in the device, also lists the expiration date of the permit number. The document also indicates that the internal calibration and diagnostic checks performed before and after the test were “OK.” (C. 74.) Finally, the document indicates that two breath tests were administered, but that only the lowest result is reported, and it indicates that result.
Both parties, as well as the Department, agree that caselaw regarding the admissibility of breath-test results from the Intox-ilyzer 5000 (“1-5000”), the predecessor device to the Draeger, and the photoelectric intoximeter (“P.E.I.”), the predecessor to the 1-5000, should be applied to the admissibility of breath tests from the Draeger to the extent that there must be evidence of the accuracy and reliability of the device, i.e., that the device was working properly when the test was administered, in order for the test results to be admissible. As to the nature of the evidence that must be presented to show that the device was working properly, however, Lum takes a different view than both the City and the Department. Lum argues that, like the requirement for admissibility of test results from the 1-5000, i.e., that evidence be presented indicating that the machine had been checked on a monthly basis, there must be evidence that the Draeger was certified annually and inspected semiannually before the test results are admissible. The City and the Department, on the other hand, argue that the admissibility requirements of the results of the Draeger are similar to the requirements for admissibility of the P.E.I., which did not require proof of periodic inspections because calibration checks were performed by the operator at the time of each breath test, in that the internal calibration checks that occur both immediately before and immediately after each breath test as well as the internal diagnostic checks that occur 128 *248 times per second are sufficient evidence that the Draeger was in proper working condition at the time of the test and that, therefore, no evidence of annual certification and semiannual electronic inspections are necessary for admission of the test results. We agree.
It is well settled that for breath-test results to be admissible pursuant to § 32-5A-194, Ala.Code 1975, the following must be established: (1) that the law-enforcement agency involved has adopted the device that was in fact used, whether it be the P.E.I., the 1-5000, or the Draeger; (2) that the test was performed according to methods approved by the Department; and (3) that the person who administered the test had a valid permit issued by the Department. See Ex parte Bush, 474 So.2d 168 (Ala.1985).
In Ex parte Reed, 492 So.2d 293 (Ala.1986), the Alabama Supreme Court addressed an argument identical to Lum’s, but with respect to breath-test results from the P.E.I.; the Court stated:
“Defendant initially contends that the State failed to lay the proper predicate for the admission of the P.E.I. test results, since it did not show that the test equipment had been periodically inspected by an agent of the State Board of Health. Defendant cites this Court to the case of Patton v. City of Decatur, 337 So.2d 321, 322-23 (Ala.1976), for the proposition that the State must show that the test was performed according to the methods approved by the State Board of Health. He then relies on the following rule of the State Board of Health:
“ ‘420-1-1-.01 Breath
“ ‘(3) Methods Approved by the State Board of Health
“ ‘(a) There shall be a periodic inspection of each breath testing instrument. The inspection shall be conducted at reasonable time intervals set by the State Health Officer through the Technical Director.’
“Rules of State Board of Health, Rule 420-1-1-01(3).
“In Ex parte Bush, 474 So.2d 168 (Ala.1985), this Court addressed the issue of what elements were necessary to lay the proper predicate for admissibility of the P.E.I. test results. There we said:
“ ‘This predicate may be established by showing, first, that the law enforcement agency has adopted the particular form of testing that was in fact used. Alabama Code 1975, § 32-5A-192(a) [sic, § 32-5-192(a) ]. See Estes v. State, 358 So.2d 1050 (Ala.Crim.App.), cert. denied, 358 So.2d 1057 (Ala.1978). Second, there must be a showing that the test was performed according to methods approved by the State Board of Health. Alabama Code 1975, § 32-5A-194(a)(l). See Commander v. State, 374 So.2d 910 (Ala.Crim.App.1978). This may be proved by the introduction of the rules and regulations the officer followed while administering the test and the officer’s testimony that he did, in fact, follow those rules when he administered the test in question. Parker v. State, 397 So.2d 199 (Ala.Crim.App.1981). Patton v. City of Decatur, 337 So.2d 321 (Ala.1976). Third, there must be a showing that the person administering the test has a valid permit issued by the State Board of Health for that purpose. Alabama Code 1975, § 32-5A-194(a)(l).’
“474 So.2d at 170.
“It is under the second element of the Bush predicate that defendant contends that the State needed to show a periodic inspection of the testing equipment as *249 part of the predicate. However, we believe that imposing such a requirement for admissibility is not justified by our previous cases on the subject, the applicable statutes, or the rules of the State Board of Health.
“In Bush, we held that it was not a necessary part of the predicate for the admissibility of the P.E.I. test results that the State show that the person who had previously calibrated the test equipment was certified by the State Board of Health. After reviewing the applicable statutes, § 32-5A-194 and § 32-5-192(a), Code 1975, and the rules promulgated by the State Board of Health, we held that such a showing would be ‘superfluous, since the accuracy of the test results depends upon the final calibration by the administrator of the test, and not the previous calibrator.’ Bush, supra.[9] Bush emphasized that the accuracy of the test results depends upon the final calibration by the test operator at the time the test is given. It is therefore the ‘methods approved by the State Board of Health’ for the point in time that the test is given that must be shown by the State as part of the predicate for admissibility.
“The methods established by the State Board of Health with respect to the point in time of the administering of the P.E.I. test is found in the following rule:
“ ‘(3) Methods Approved by the State Board of Health
[[Image here]]
“ ‘(b) Approval of Instrumentation.
“ ‘1. Photo-electric Intoximeter. The approved procedure, technique, or method of operation appears on the Photo-electric Intoximeter Operating Record Card.’
“Rules of State Board of Health, Rule 420-l-l-.01(3)(b). The clear import of this rule is that the test operator must follow the method or procedure outlined on the ‘operating record card’ when administering the P.E.I. test. It is this method, stated on the operator’s card, which the test operator must testify to in order to satisfy the predicate for admissibility of the P.E.I. test results. Therefore, there is no need for the State to offer testimony concerning a periodic *250 inspection of the testing equipment in order to lay the predicate for admissibility of the P.E.I. test results.”
492 So.2d at 294-95.
As in Ex parte Reed, Lum’s argument centers on the second element of the statutory predicate for admission of breath-test results: that the test be performed according to methods approved by the Department. Lum does not challenge the first or third elements of the statutory predicate, and the record reflects that the State established each of those elements. Officer Fillmore testified that the Draeger had been specifically approved by the City of Brewton as its breath-testing device and that he had a permit from the Department to operate the Draeger. The only question in this case, as in Ex parte Reed, is whether the annual certification and semiannual inspections contained in Reg. 370-1 — 1—.02(2) are part of the “methods” approved by the Department that must be proven for admission of the breath-test results. We hold, as the Supreme Court did in Ex parte Reed, that they are not; it is the methods for the point in time the test is given that must be shown as part of the statutory predicate for admissibility. As noted in Reg. 370-l-1.01(4)(b), the approved methods for the Draeger device for the point in time that the test is administered are contained within the device’s computer software, which, upon initiation of a testing sequence, automatically requires the operator to input certain information and then performs internal calibration and diagnostic checks.
We recognize that, when Alabama began using the 1-5000, the Alabama Supreme Court held that for 1-5000 breath-test results to be admissible proof that the device had been inspected on a monthly basis was necessary. However, the Court did so because of the differences between the P.E.I. and 1-5000 devices; the Court stated, in relevant part:
“In numerous cases, this Court and the Court of Criminal Appeals have addressed the requirements for admission of evidence of chemical tests for intoxication. For cases holding that no proper predicate was laid, see, e.g., Commander v. State, 374 So.2d 910 (Ala.Cr.App.1978), cert. quashed, 374 So.2d 921 (Ala.1979); Webb v. State, 378 So.2d 756 (Ala.Cr.App.1979), cert. denied, 378 So.2d 758 (Ala.1979); McGough v. Slaughter, 395 So.2d 972 (Ala.1981); Whetstone v. State, 407 So.2d 854 (Ala.Crim.App.1981); Moore v. State, 442 So.2d 164 (Ala.Cr.App.1983); Kent v. Singleton, 457 So.2d 356 (Ala.1984); Ex parte Reed, 492 So.2d 293 (Ala.1986); and Ex parte Curtis, 502 So.2d 833 (Ala. 1986). For cases holding that a proper predicate had been laid, see, e.g., Patterson v. State, 344 So.2d 543 (Ala.Cr.App.1977), cert. denied, 344 So.2d 547 (Ala.1977); Estes v. State, 358 So.2d 1050 (Ala.Cr.App.1977), cert. denied, 358 So.2d 1057 (Ala.1978); Bagony v. City of Birmingham, 365 So.2d 336 (Ala.Cr.App.1978); Parker v. State, 397 So.2d 199 (Ala.Cr.App.), cert. denied, 397 So.2d 203 (Ala.1981); Childress v. City of Huntsville, 459 So.2d 1008 (Ala.Cr.App.1984); Harper v. City of Troy, 467 So.2d 269 (Ala.Cr.App.1985); Ex parte Bush, 474 So.2d 168 (Ala.1985); Nagem v. City of Phenix City, 488 So.2d 1379 (Ala.Cr.App.1986); Brown v. City of Montgomery, 504 So.2d 748 (Ala.Cr.App.1987); Pate v. State, 512 So.2d 138 (Ala.Cr.App. 1987); Jemison v. State, 513 So.2d 47 (Ala.Cr.App.1987); Baker v. City of Huntsville, 516 So.2d 927 (Ala.Cr.App.1987); Sanders v. City of Birmingham, 542 So.2d 325 (Ala.Cr.App.1988); and Seewar v. Town of Summerdale, 601 So.2d 198 (Ala.Cr.App.1992).
*251 “In none of the above-cited cases, however, was the argument made that the rules shown to have been adopted were insufficient to ensure accuracy and reliability. Most of the cases pertain either to blood tests or to breath tests administered on the photoelectric intox-imeter (P.E.I.) machine. Of the above-cited cases, only Baker and Sanders concerned Intoxilyzer 5000 '(‘1-5000’) machines. Pate involved the question whether the evidence showed that the officer who administered the P.E.I. test had performed step 18 of the procedures for that machine. The P.E.I. was more complex to operate than the 1-5000 is, and much of the litigation regarding it arose from the fact that it could be calibrated at the time of a breath test by the officer administering the test. Thus, in Bush, this Court held that it was not necessary to show that the person who performed monthly inspections was certified by the Board of Health, because any calibration performed by the inspector was superfluous, ‘since the accuracy of the test results is dependent upon the final calibration by the administrator of the test, and not the previous calibrator.’ 474 So.2d at 170. Similarly, Reed held that there was no need to show periodic testing of a P.E.I. machine because of the final calibration made by the officer administering the test. 492 So.2d at 294-95.
“By contrast, an 1-5000 machine cannot be calibrated by an inspector or an operator, and if it gives inaccurate readings it must be returned to a manufacturer-authorized repair facility. Thus, while the procedures for operating it are much simpler than the procedures for the P.E.I., the necessity'for ascertaining that it has given an accurate result in a particular test cannot be met by a showing that the officer administering the test has followed the operating rules promulgated by the Board of Health.
[[Image here]]
“There was evidence that, before and after a breath test, the 1-5000 sets itself to zero. Dr. Jensen explained that this was not an internal check for calibration or accuracy, but only the setting of a baseline to adjust for the presence of any alcohol in the air of the room. This setting to zero, according to Dr. Jensen, does not assure that the 1-5000 will accurately measure a breath sample. The DFS [Department of Forensic Sciences] witnesses did not contradict Dr. Jensen’s testimony in this regard. Based on this evidence, we hold that the Court of Criminal Appeals in Harris v. State, 601 So.2d 1099 (Ala.Cr.App.1991), erroneously followed Ex parte Reed, 492 So.2d 293 (Ala.1986), in holding:
“ ‘The State is not required to prove that the machine used for testing had been previously determined to be accurate and had been periodically inspected. Ex parte Reed, 492 So.2d [at] 294 (Ala.1986). Trooper Hall testified that the instrument checks itself, sets to zero, takes its sample, then resets to zero, thus establishing the internal accuracy checks. Hence, it was merely harmless error for the trial court to allow Hall to testify concerning the log.’
“601 So.2d at 1102 (emphasis added [in Ex parte Mayo]). Reed concerned a P.E.I. machine, which, as explained above, was calibrated by the operator at the time of a breath test. The error in the conclusion that the 1-5000 internally checked itself for accuracy was not apparent from the record in Harris (this Court quashed its writ of certiorari), but, now that the error is apparent from Dr. Jensen’s testimony, we overrule *252 Harris to the extent that it relied on such a conclusion.
[[Image here]]
“... [T]he failure to verify the accuracy and reliability of the 1-5000 at each individual breath test makes the monthly inspection more critical. We contrast this situation with the situation involving the P.E.I. machine, which was calibrated each time a test was given, causing the Court to hold in Bush and Reed that this individualized calibration made the monthly inspection less important.
[[Image here]]
“... At a minimum, DFS should adopt ... particularized rules to ensure that the Intoxilyzer 5000 machines are effectively inspected for accuracy and reliability. If DFS chooses to adopt the procedures advocated by Mayo’s witness for testing the machine with a simulator at the time of a breath test and for administering two breath tests, the significance of any periodic inspections will decrease ....”
Ex parte Mayo, 652 So.2d 201, 205-09 (Ala.1994)(emphasis added).
It is clear from the testimony presented at trial as well as from the regulations of the Department that the Draeger is more akin to the P.E.I. than it is to the 1-5000. Unlike the situation with the I-5000, the fact that the person administering the test followed the operating rules of the Department for the point in time the test is given alone establishes that the Draeger has given an accurate result in a particular test. The Draeger device is entirely computerized and controlled by software; when a test sequence is initiated, the operator must follow a checklist, just as with the P.E.I., and input certain information, see Reg. 370-l-l-.01(4)(b). If any of the information is not properly input, the device aborts the testing sequence. In addition, the device performs a calibration check immediately before each breath test and immediately after each breath test, as well as internal diagnostic checks 128 times per second. Unlike the 1-5000, the calibration and diagnostic checks do not merely reset the device to zero, they actually check the device to make sure it is in proper working order. If either of the calibration checks or internal diagnostic checks indicates a problem with the device, the testing sequence is aborted and no test results will be produced. Under these circumstances, just as with the previous P.E.I., it would be superfluous to require that both the annual certifications and the semiannual inspections of the Draeger device be proven when it is clear that the accuracy of the test results from the Drae-ger depends on the calibration checks and internal diagnostic checks performed by the device itself at the time each breath test is administered. Therefore, we hold that proof of the annual certifications and semiannual inspections contained in Reg. 870-1-1-02(2) are not a necessary part of the statutory predicate for admission of breath-test results from the Draeger.
In this case, the record reflects that the City established the statutory predicate for admission of the test results. As noted above, Officer Fillmore testified that the City of Brewton had approved the Draeger as a breath-testing device and that he had a permit from the Department to operate the Draeger, thus satisfying the first and third elements of the statutory predicate. In addition, Officer Fillmore testified that he followed the normal procedure for administering the test — inputting the appropriate information and observing the appropriate 20-minute deprivation period — and that the certificate of analysis produced by the Draeger showed that the device was operating properly at the time of the test and that two breath tests had *253 been administered, but only the lowest result was reported, thus satisfying the second element of the statutory predicate. We also note that the certificate of analysis that the City introduced into evidence also establishes the second and third elements of the statutory predicate by itself. The certificate specifically states that the person operating the machine had a valid permit from the Department. In addition, as noted above, the failure to follow the procedure contained in the device’s software, the procedure specifically approved by the Department in its rules, results in the device aborting the test sequence and not producing any results. Thus, the mere fact that the device produced the certificate with a test result[10] shows that the methods approved by the Department in Reg. 370-1-1-.01 were followed in administering the test.
Because the City properly established the statutory predicate for admission of Lum’s test results from the Draeger, the trial court properly admitted those results into evidence.[11]
H.
Lum also contends that the trial court erred in denying his motions for a judgment of acquittal, made at the close of the State’s case and at the close of all the evidence, because, he says, the evidence was insufficient to sustain his conviction for DUI. Specifically, Lum argues that without the results of the Draeger breath test, there was no evidence indicating that he was driving under the influence of alcohol. However, we have already determined in Part I of this opinion that the results from the Draeger breath test were properly admitted. Suffice it to say, the test results, along with Officer’s Fillmore’s observations of Lum, were more than sufficient to sustain Lum’s conviction for DUI. Therefore, the trial court properly denied Lum’s motions for a judgment of acquittal.
Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.

.Lum was charged in the alternative with violating § 32-5A-191(a)(l) (driving or being in actual physical control of a vehicle while “[tjhere is 0.08 percent or more by weight of alcohol in his or her blood”) and § 32-5A-191(a)(2) (driving or being in actual physical control of a vehicle while ''[u]nder the influence of alcohol”).

. Lum was also convicted of speeding; however, he does not appeal his conviction for that offense.

. Officer Fillmore testified that Lum told him that he could not perform the ”heel-to-toe” test because he had been injured in an accident.

. We note that Lum also argues, as Issue III in his brief, that the trial court erred in not including in the record (and in denying his motion to supplement the record) a copy of the regulations of the Department of Forensic Sciences that was marked as an exhibit at trial, although not formally introduced into evidence. According to Lum, without a copy of these regulations, the record is incomplete and this Court cannot conduct an adequate review. However, courts may take judicial notice of the regulations of the Department of Forensic Sciences regarding breath-alcohol testing procedures, and we do so in this case. See, e.g., Vizzina v. State, 533 So.2d 652 (Ala. *244 Crim.App.1987), aff’d, 533 So.2d 658 (Ala.1988); § 32-5A-194(a)(1), Ala.Code 1975.

5. The Draeger Alcotest 7110 MK III and the Draeger Alcotest 7110 MK III-C are the same instrument. See Hill v. City of Florence, 874 So.2d 585, 587 (Ala.Crim.App.2003), and Kirby v. State, 874 So.2d 581, 584 (Ala.Crim.App.2003).

. In its brief, the Department notes that, effective August II, 2003, it implemented new regulations "retiring the Intoxilyzer 5000” as an approved breath-testing device, rescinding Reg. 370-1-1.02 (relied on by Lum), and relegating the inspections and certifications of the Draeger device to an appendix to the regulations. (Department’s brief at pp. 12-13.)

. The City introduced into evidence a photocopy of Officer Fillmore's permit without objection by Lum.

. Officer Fillmore stated that right before Lum was about to give a breath sample, Lum said that he had belched and could not take the test. Officer Fillmore then aborted the testing sequence on the machine and initiated a second testing sequence, imposing another 20-minute deprivation period oñ Lum.

9. In Ex parte Bush, 474 So.2d 168 (Ala.1985), the Court stated:
"Nowhere in Alabama Code 1975, § 32-5A-194 or § 32-5-192(a), do we find the requirement that the person who merely calibrates the machine must be certified by the State Board of Health. Bush contends this requirement should be inferred, arguing that it is illogical to require certification of the person administering the test, but not the person who calibrates the machine. We are not persuaded by this argument.
"The methods and procedures set by the State Board of Health require the certified operator who administers the PEI test to follow a checklist every time the test is given. This checklist includes the procedure for calibration of the photoelectric in-toximeter. Rules of State Board of Health Administration, Rule 420-l-l-.01(4)(Ap-pendix A). Thus, the machine’s final calibration is performed by the administrator of the test, who must be shown to be certified. To require that the person who had previously calibrated the machine be shown to be certified is therefore superfluous, since the accuracy of the test results is dependent upon the final calibration by the administrator of the test, and not the previous calibrator. Likewise, since the administrator of the test must be shown to have followed the methods required by the State Board of Health in the final calibration of the machine, it is equally superfluous to require a showing that the previous calibration was performed according to those methods. We therefore reject this additional requirement for the laying of a predicate for the admission of PEI test results into evidence.”
474 So.2d at 170.

. When the device aborts a testing sequence, it produces a certificate indicating that the test had been aborted. (C. 75.)

. Because we hold that the City laid the statutory predicate for admission of the test results, we do not address Lum’s alternative argument that the City failed to establish the traditional evidentiary predicate.